**Sonja Kemper MASSIE, Plaintiff,**

v.

**INDIANA GAS COMPANY, Defendant.**

**No. IP88–1456C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 30, 1990.

J. Kevin King, Virginia E. Hench, Cline, King & King, Columbus, Ind., for plaintiff.

Mindy K. Dale, Jay R. Larkin, Barnes & Thornburg, Indianapolis, Ind., for defendant.

BARKER, District Judge.

This matter comes before the court on the plaintiff's motion for partial summary judgment and the defendant's motion for summary judgment, both filed on March 13, 1990. For the reasons discussed below, the plaintiff's motion is granted in part and denied in part, as is the defendant's motion.

## I. Background

Plaintiff Sonja Kemper Massie (hereinafter "Sonja," the convention adopted by the parties) began this suit against her former employer, defendant Indiana Gas Company, Inc. ("Indiana Gas") in state court on December 7, 1988. Defendant removed the suit to federal court. As amended, the plaintiff's complaint consists of two counts. Count I alleges that Sonja was discharged by the defendant for exercising her rights under the defendant's employee welfare benefit plan, in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Count II alleges that Indiana Gas willfully discharged that plaintiff because of her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626(b).

The plaintiff alleges that she was employed by the Central Indiana Gas Company, Inc., from April 13, 1973, until this company was purchased by defendant Indiana Gas in 1976. She continued to work for Indiana Gas until she was discharged on January 18, 1988. The plaintiff alleges that she received acceptable overall performance ratings and wage increases each year from 1973 to 1986. She also claims to have received two service awards during the course of her employ.

On approximately August 31, 1987, Sonja, who was then 48 years old, contracted meningitis and was hospitalized for several months. Plaintiff alleges that it was during this period of absence, for which she was drawing short term disability benefits, that the decision was made to fire her. Plaintiff returned to work on January 4, 1988, and was discharged on January 18, 1988. The plaintiff claims that she was replaced by Indiana Gas employee Pam Huffman, who was apparently age 36 at the time.

Subsequent to her discharge, Sonja sought employment and was hired by G.W. Bartlett in May, 1988. In October, 1988, the plaintiff quit her job at G.W. Bartlett, got married, and moved with her husband to Tennessee. She currently lives six months each year in Tennessee and the remaining six months in Florida. It appears that she now works helping her retired husband restore cars.

Plaintiff has moved for summary judgment on the issues of whether she has established a prima facie case under ERISA and under ADEA, as well as on the defendant's affirmative defense on exhaustion. The plaintiff's summary judgment motion as to the exhaustion defense is mooted by the defendant's withdrawal of this defense. The defendant has moved for summary judgment on both counts of the plaintiff's complaint, as well as on the issue of plaintiff's eligibility to receive front and back pay after October, 1988.

The defendant contends that the plaintiff's request for summary judgment regarding the establishment of her prima facie case is not within the contemplation of Fed.R.Civ.P. 56(c). The court disagrees, finding that a ruling on the plaintiff's motion will appropriately narrow the issues in dispute and thus lead to a more efficient resolution of this litigation. Moreover, such an argument is inconsistent with the defendant's own request for summary judgment on the issues of front and back pay.

## II. Discussion

### A. *The Age Discrimination Claim*

■ As noted by both parties, the Seventh Circuit has adopted in ADEA cases a variation of the burden-shifting analysis established by the Supreme Court for employment discrimination cases.

As applied to an ADEA claim, this analysis requires that a plaintiff show that he or she: 1) belongs to the protected class (age forty or older); 2) was qualified for his or her position; 3) was terminated;

and 4) was replaced by a younger person. After the plaintiff has established a prima facie case, the defendant employer then has the burden of presenting evidence that the plaintiff's discharge was a result of "some legitimate, nondiscriminatory reason." If the defendant meets this burden of production, the burden shifts to the plaintiff to prove that the reasons proffered by the employer for the discharge were merely a pretext for discrimination. Throughout the trial, the burden remains with the plaintiff to prove there was discrimination, rather than with the employer to prove the absence of discrimination.

*Metz v. Transit Mix, Inc.*, 828 F.2d 1202, 1204 (7th Cir.1987) (citations omitted).

However, in a situation where the discharge of the plaintiff results from or occurs in conjunction with a reduction in the work force, the fourth element of the prima facie case drops out. *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 96–97 (7th Cir.1985). Thus, while there is some disagreement between the parties as to whether Sonja was replaced or the work force reduced, this dispute is not material and will not impede resolution of these summary judgment motions.

Turning to the first three elements of the plaintiff's prima facie case, there appears to be no factual question as to whether the plaintiff (age 49) belongs to a protected class, was qualified for her position, and was terminated. So much is admitted in briefs submitted by the defendant. *See* Defendant's Brief in Support of its Motion for Summary Judgment at p. 11, Defendant's Response Brief to Plaintiff's Motion for Summary Judgment at p. 3. However, to say that the plaintiff was qualified for her job indicates that she was capable of performing adequately, not that she was indeed so performing.

That distinction leads to the next step in the analysis of an ADEA claim. With the establishment of a prima facie case, it becomes the defendant's burden to prove that the plaintiff's discharge was brought about for legitimate reasons. Here, the defendant contends that Sonja was discharged in part because of inadequacies in her performance but mainly because of excessive absences occurring since 1980. The problems with Sonja's performance were discovered during her absence due to meningitis in the fall of 1987. These deficiencies were detailed in a memo which was discussed in a meeting held by Indiana Gas managers for the purpose of determining whether the discharge of Sonja was appropriate. The plaintiff has not contested that these incidents did in fact occur. The incidents listed in the memo and viewed by Indiana Gas as deficiencies in her performance included such things as the plaintiff's failure to return keys to Indiana Gas customers whose meters were moved out of their homes and her failure to make adjustments to bills. While these deficiencies factored into the defendant's decision to discharge Sonja, her supervisor, Larry Faughnder, the man who apparently initiated the decision to discharge the plaintiff, testified that these problems alone would not have been sufficient to result in the plaintiff's discharge from her employment.

Defendant maintains that the main factor resulting in the plaintiff's discharge was the extent of her absences, beginning in 1980. This history of absences was documented by time records which were compiled into an absent overtime report. While the composite report contains no indication as to the cause of the absences, the time records do indicate whether an absence was paid sick time or an unpaid absence (with no further explanatory details). Roberts Deposition, p. 38. Comparing the time when plaintiff was absent from, but expected to be at, work with the total potential work time available (thus excluding voting, holiday, and vacation time), the plaintiff had an absenteeism rate of 15.76%. Faughnder Deposition Ex. # 35.

Sonja was cautioned about her unacceptably high level of absences in annual performance reviews dated in 1981, 1982, 1985, and 1986, although in each of these years, Sonja received overall ratings (including consideration of absences) which were acceptable. The plaintiff also received a

three day suspension as punishment for her failure to notify the defendant of an occasion when she would not be able to work. Various Indiana Gas managers maintained that the company's policy with regard to absences was that they begin with the assumption that zero absences are expected. *See* Horvath Deposition, p. 68–69; Faughnder Deposition, p. 94. While it does not appear from the testimony contained in the depositions of Indiana Gas employees submitted to the court that there was a specified level of unacceptable absences (indeed, it appeared that such a determination was made on a case-by-case basis), all the Indiana Gas management level employees whose depositions were submitted testified that the plaintiff's rate of absences was unacceptably high and prompted her discharge.

The plaintiff contends that her absenteeism does not constitute a nondiscriminatory reason for discharge. This argument is premised upon a comparison of the treatment accorded pregnant employees of Indiana Gas, who have the option of choosing a maternity leave to last for a period certified by a physician, followed by what is termed "positive job security" under Plan C in a benefit booklet distributed to Indiana Gas employees. The plaintiff contends that older employees are off work for less time than those who are pregnant, and yet while the pregnant women may choose the "positive job security" of Plan C, the older workers who ordinarily will not have the opportunity to take advantage of Plan C and who are absent risk losing their jobs. Plaintiff argues that protecting pregnancy but not other medically necessary leave constitutes age discrimination.

The defendant responds that to provide protection to pregnant workers merely accords with congressional intent as expressed in the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k). For this they cite *California Federal Savings and Loan Ass'n v. Guerra*, 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). However, neither the PDA nor the cited decision supports their defense. The PDA provides in relevant part that "women affected by pregnancy, childbirth, or related medical conditions shall be *treated the same* for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work ..." (emphasis added). At issue in *California Federal* was whether a California statute providing for preferential treatment for pregnant workers was pre-empted by the PDA. In reaching the conclusion that the state statute was not pre-empted, the Supreme Court relied on legislative history that showed a congressional "intent not to require preferential treatment...." 479 U.S. at 287, 107 S.Ct. at 693. Here, plaintiff's argument begins with the proposition that Indiana Gas accords preferential treatment to pregnant workers. Thus, reference to the PDA does not serve as a defense to the plaintiff's charge, as the PDA does not evince a congressional intent to accord better treatment to pregnant workers than is given to other medically disabled employees.

Having said that, the burden still rests upon the plaintiff to show that the defendant's policy was in fact preferential in its application to pregnant women, and that the effect of this was that young women were consistently less likely to be terminated for extended absences than were older women with absences of comparable length. It appears that the amount of evidence which would be required to make such a claim would be daunting, and here the plaintiff has not come close. The plaintiff has given the examples of two younger women who took pregnancy leaves but later returned to work, in contrast to Sonja's history of absences and termination, plus reference to the treatment accorded the two older workers. Initially, the court notes that reference to the treatment of only these employees is hardly sufficient to suggest the inferences that plaintiff wants this court to draw. Moreover, despite all the discovery that has been conducted in this case, there is no evidence that the younger employees had histories of absence or performance records which were comparable to Sonja's or the other older employees. The existence of these variables makes impossible an effective compari-

son of the treatment accorded pregnant workers as opposed to older workers. Casting the defendant's policy for pregnant workers as drawing a line between young and old also oversimplifies the reality of the situation. For example, there will undoubtedly be young female workers who will be unable to take advantage of the pregnancy leave, thus showing that the defendant's policy does not simply work to favor younger workers over older ones. Moreover, Plaintiff's Exhibit 15 submitted with the answer brief, a report on live births and fetal deaths by age of mother for 1986, does little if anything to fill the evidentiary gaps in the plaintiff's argument. While it is true that on this motion for summary judgment the court must "view the evidence in the light most favorable to the plaintiff," *Stumph*, 770 F.2d at 98, this duty does not oblige the court to fabricate evidence where in fact the plaintiff has presented none. The plaintiff has failed to present enough evidence to create a factual issue as to whether the defendant's policy towards pregnant women worked a form of age discrimination at Indiana Gas.

■ By contrast, there is testimony from Indiana Gas managers that they understood the "positive job security" of Plan C to be commanded by federal law, helping to dispel any suggestion that there was an intent on their part to give preferential treatment to pregnant workers and discriminate on the basis of age. Their testimony also indicates that all employees with excessive absences were subject to being discharged, regardless of the reasons for those absences, even including pregnancies. Ronald L. Shields, Director of Compensation and Benefits at Indiana Gas, testified, "We don't track [the number of people who take maternity leave] any differently than anything else. We don't keep separate records of who has one type of disability versus another or the cause for that." Shields Deposition, p. 134, lines 10–13. Kenneth Roberts, Vice President of Human Resources at Indiana Gas, when asked to describe the difference in treatment of an individual on short term disability and an individual on maternity disability, answered, "There is no difference." Roberts Deposition, p. 278, line 16. When questioned about the existence of positive job security for those employees on short term disability as compared with maternity disability, Mr. Roberts testified:

> [T]he same process would be applied on excessive absenteeism to any employee regardless of the reasons for disability.... We wouldn't treat an employee any differently if they were absent sixteen percent of the time each year for maternity than we would a person if they were absent sixteen percent of the time for any other disability.

Roberts Deposition, p. 280, lines 1–10.

Plaintiff has, at least thus far, failed to show, in light of the defendant's policy for pregnant women, that absenteeism was not a nondiscriminatory reason for her termination.

The defendant having offered legitimate and nondiscriminatory reasons for the discharge of the plaintiff, the burden is then on the plaintiff to show that these reasons were merely pretextual. It is at this point in the analysis that factual issues arise which preclude summary judgment.

Plaintiff has submitted the affidavits of former Indiana Gas employees Martha Harshman and Nancy Barth. Martha Harshman testified that she was forced into early retirement by Indiana Gas, and that she had observed a pattern of pressure to retire directed at older workers at Indiana Gas. Affidavit of Martha Harshman, p. 3. Nancy Barth testified to having observed similar patterns of age discrimination at Indiana Gas. Affidavit of Nancy Barth, p. 4.

■ Nancy Barth also testified concerning a lawsuit she filed charging age discrimination against Indiana Gas, which suit was settled out of court. *Id.* In regard to this matter, the defendant maintains that Nancy Barth was given $300.00 for dropping an EEOC claim, with no admission of liability by the defendant. However, whether the court ought to consider such an allegation is answered in the persuasive reasoning of Judge Aspen in *Scaramuzzo*

*v. Glenmore Distilleries, Co.*, 501 F.Supp. 727 (N.D.Ill.1980). In *Scaramuzzo*, an age discrimination case, Judge Aspen found that the policy considerations underlying Federal Rule of Evidence 408 (regarding the exclusion of prior settlement offers) required exclusion of settlement offers made by the defendant in related cases. 501 F.Supp. at 733. Judge Aspen also found that the insignificant probative value of the filing of age discrimination charges would be outweighed by the unduly prejudicial inferences that would arise as a result of testimony as to the mere filing of such charges. *Id.* The same considerations which motivated Judge Aspen in *Scaramuzzo* likewise prompt this court to find Nancy Barth's testimony regarding the filing and settlement of an EEOC claim to be inadmissible. These allegations would thus not preclude summary judgment in favor of the defendant.

However, the remaining testimony of Nancy Barth, as well as the testimony of Martha Harshman, do tend to suggest that the reasons offered by Indiana Gas for the discharge of the plaintiff might have been pretextual for its discriminatory motive. The defendant argues that such testimony is irrelevant. Here, both Nancy Barth and Martha Harshman testified as to actions taken by Larry Faughnder, the same man who was the plaintiff's supervisor.[1] While it may turn out that the testimony of Nancy Barth and Martha Harshman is so statistically insignificant as to be irrelevant, or inadmissible as unfounded speculation, *cf. Haskell v. Kaman Corp.*, 743 F.2d 113, 121 (2nd Cir.1984), such a finding by this court would require further development of their testimony and can not and should not be made in resolving defendant's motion. At this point in the litigation, the testimony of Nancy Barth and Martha Harshman regarding treatment they received from Indiana Gas appears relevant and admissible. *Cf. Scaramuzzo*, 501 F.Supp. at 733, n. 7.

Their testimony directly conflicts with the testimony of Indiana Gas managers

stating that the plaintiff was terminated mainly for her absenteeism, but also in part for her performance deficiencies. Based on the material submitted to the court, it seems clear that the defendant would be entitled to summary judgment on the second step of proof in an age discrimination case, an offering of legitimate and nondiscriminatory reasons for the plaintiff's discharge. However, because the defendant did not request such a ruling, and because the case must stay alive with regard to the question of whether such reasons are pretextual, the court will not reach that explicit conclusion about the second step of proof. There existing a question of fact on a material issue, the court must deny the defendant's motion for summary judgment as to the ADEA claim. However, as there were no factual issues involved in the plaintiff's establishment of a prima facie case, the plaintiff's motion for partial summary judgment is granted to that extent.

### B. The ERISA Claim

■ The plaintiff contends that she was discharged in violation of ERISA because she exercised rights to benefits to which she was entitled under the defendant's employee welfare benefit plan, such benefits allegedly including sick leave with and without pay, as well as short term disability payments. As the plaintiff has maintained, a discharge for the purpose of depriving an employee of continued participation in an insurance program states a cause of action under § 510 of ERISA, 29 U.S.C. § 1140. *Kross v. Western Elec. Co.*, 701 F.2d 1238, 1243 (7th Cir.1983). Both parties have agreed that the employee welfare benefit plan covered by ERISA and at stake here is the short term disability plan offered by the defendant for its employees. The parties disagree as to whether paragraph H, "Sick Leave Without Pay," on page 6.04 of Indiana Gas' Organization and Policy Manual, is within the definition of "employee welfare benefit

---

1. This case is thus distinguishable from *Schrand v. Federal Pacific Elec. Co.*, 851 F.2d 152, 156 (6th Cir.1988), where the employees whose testimony was at issue worked in offices in different regions of the country.

plan" found in 29 U.S.C. § 1002(1). The defendant argues that this sick leave without pay, accorded at the supervisor's discretion, is a payroll practice and therefore excluded from the protective scope of ERISA pursuant to 29 CFR § 2510.3–1(b)(2). While it is difficult to imagine a policy which does not provide for any compensation being properly construed as "a payroll practice," it is even more difficult to understand how such a plan would fit within the definition of an employee welfare benefit plan, as defined at 29 U.S.C. § 1002(1). The plaintiff merely asserts that this policy "is clearly the type of benefit which is protected...." Brief in Support of Plaintiff's Motion for Summary Judgment, p. 7. Indeed, the opposite seems true, especially in light of the fact that the use of such leave is at the supervisor's discretion.

ERISA does not create new benefits for employees; the sick leave policy in paragraph H was, by its own terms, discretionary, and plaintiff has not shown how an ERISA claim can arise simply because such discretion is exercised. The plaintiff has, herself, foreclosed consideration of the issue of pension benefits. While the plaintiff does mention that she was "one year short of being eligible for pension benefits when she was fired," *id.*, the issue of pension benefits was not otherwise raised in the complaint. In sum, "exactly the point of plaintiff's ERISA claim [is]: That she was terminated for using her short term disability payments while on 'unpaid' sick leave." *Id.*

The only remaining issue to be resolved under the ERISA count of the complaint is thus whether a desire on the part of Indiana Gas to prevent the plaintiff from enjoying any continuing participation in the short term disability plan was a motivating factor leading to her discharge. *Gavalik v. Continental Can Co.*, 812 F.2d 834, 860 (3rd Cir.1987); *Nemeth v. Clark Equipment Co.*, 677 F.Supp. 899, 903 (W.D.Mich. 1987).

■ The order of proof applicable to this claim is similar to that in age and other types of employment claims. The plaintiff begins with presentation of a prima facie case. Once such a case is established by the plaintiff, the burden of proof shifts to the defendant to offer legitimate and nondiscriminatory reasons to explain the employer's conduct. The defendant having made such a showing, the burden of proof returns to the plaintiff to show that the reasons offered by the defendant were merely pretextual. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111–12 (2nd Cir.1988); *Gavalik*, 812 F.2d at 852–53.

■ There is some variation among the courts regarding what the content of the plaintiff's prima facie case should be. The Third Circuit had developed an approach apparently tied to the wording of § 510 of ERISA.

> [I]n order to make out 'a prima facie case under ERISA § 510, an employee must demonstrate (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.'

*Hendricks v. Edgewater Steel Co.*, 898 F.2d 385, 389 (3rd Cir.1990) (quoting *Gavalik*, 812 F.2d 834, 852 (3rd Cir.1987)). Recognizing the difficulty of proving an intent to discriminate, the *Hendricks* court did not modify the structure of the prima facie case, but allowed a plaintiff to meet this burden of proof with circumstantial evidence. *Hendricks*, 898 F.2d at 389. However, a slightly more recent Third Circuit decision followed an approach elaborated by the Second Circuit. Under this version, to establish an ERISA prima facie case

> the plaintiff must show that he [she] (1) belongs to the protected class, (2) was qualified for the position involved, and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent was present.

*Turner v. Schering–Plough Corp.*, 901 F.2d 335, 347 (3rd Cir.1990) (citing *Dister*, 859 F.2d at 1115)).

This court views the latter approach as more closely resembling the standard prima facie framework initially established

for employment discrimination cases by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Moreover, it seems more fairly to take into account the difficulties inherent in proving an employer's improper intent.

Adopting this framework, therefore, the parties' submissions will now be considered in order to determine if a prima facie case has been established. The determination has already been made in connection with the ADEA claim that Sonja was qualified, in the sense of being capable to perform her job.

■ The protected class for purposes of an ERISA § 510 claim has been defined by the Second Circuit as "those employees who have an opportunity to attain rights in a covered benefit plan." *Dister*, 859 F.2d at 1115. *See also Kelly v. Chase Manhattan Bank*, 717 F.Supp. 227, 232 (S.D.N.Y. 1989) (protected class includes "employee[s] who may be entitled to the benefit of a covered plan"). However, applying this straightforward definition to the plaintiff here is slightly problematic. Both parties have agreed that Indiana Gas' short term disability policy is an employee welfare benefit plan covered by ERISA. However, an employee is only eligible to receive such benefits after five consecutive workdays of absence. Sonja had been working for two weeks, apparently without absence, prior to the date on which she was discharged. To label her a member of a protected class based on the possibility that she might one day again become eligible to receive short term disability benefits seems to run counter to the proposition that a claim based on the possible accrual of additional benefits is not cognizable under ERISA § 510. *See Kelly*, 717 F.Supp. at 232, and cases cited therein. However, the decision to discharge Sonja was formulated in the fall of 1987, during a period in which Sonja was receiving benefits under the short term disability plan. Sonja was undoubtedly within the protective reach of ERISA at that time. Moreover, the propriety of considering the plaintiff a member of a protected class is

especially apparent in light of the plaintiff's theory that she was discharged to prevent any future use of such benefits. Also persuasive is plaintiff's argument that the defendant cannot avoid the mandates of ERISA simply by waiting a short period of time after the use of a benefit to effect a decision to discharge allegedly based upon considerations prohibited by ERISA.

The remaining element of the plaintiff's prima facie case requires evidence that the plaintiff was terminated under circumstances suggesting that the employer was motivated by impermissible considerations. Here, the plaintiff has failed to meet her burden.

The plaintiff quotes her former supervisor, Larry Faughnder, as having said on page 185 of his deposition that she was " 'off again on insured sick leave.' " Brief in Support of Plaintiff's Motion for Summary Judgment, p. 7. The defendant, in its response brief, pointed out how, by relying on that statement, the plaintiff had misconstrued Mr. Faughnder's testimony. Mr. Faughnder was being questioned with regard to a statement he had written in a memo.[2] When read in context, Mr. Faughnder's statement ("Currently, Ms. Kemper is again on insured sick leave.") appears to be no more than an innocuous update as to Sonja's status at the time the memo was written. His deposition testimony corroborated that interpretation and continued to the effect that he was disturbed, not by Sonja's use of insured sick leave, but by the fact that she was not present to do her job. Faughnder deposition, p. 185.

The plaintiff responds to the defendant's characterization of Faughnder's testimony by saying that it "must be read in context with the deposition testimony of other Indiana Gas officers and administrators...." Plaintiff's Reply Brief, p. 7. However, after reading the depositions of these Indiana Gas employees, who were all involved in the decision to terminate the plaintiff, it becomes clear that Sonja was not terminated because of a desire on the

---

**2.** Deposition exhibit number 32.

defendant's part to prevent her from drawing short term disability benefits. When Ronald Shields, Director of Compensation and Benefits at Indiana Gas, was asked whether Sonja was terminated due to excessive absenteeism, he answered, "That in combination with her performance had an impact on it." Shields Deposition, p. 61. Frank Horvath, supervisor of labor relations in Indiana Gas' Human Resources department, when asked the reason for the plaintiff's discharge, answered, "Absenteeism." Horvath Deposition, p. 173, line 22. When asked why he had written in reference to Sonja that "She is unable to maintain satisfactory attendance," Mr. Horvath answered in part, "That was the sole purpose for termination, discharge." Horvath Deposition, p. 177, lines 10–15. Kenneth Roberts, Vice President of Human Resources, testified, "[T]he reason [Sonja] was terminated is because she could not maintain satisfactory attendance. And that's it." Roberts Deposition, p. 109, lines 22–24. Plaintiff's attorney J. Kevin King questioned Sonja's former supervisor Larry Faughnder, as follows:

Q So essentially is it your testimony, sir, that you terminated [Sonja] because of absenteeism in spite of the fact that they were due to illnesses?

A I terminated her because she wasn't at work. . . .

Q So essentially you terminated her because she was ill; is that correct?

A I terminated her because she wasn't at work.

Faughnder Deposition, p. 100, lines 3–6, 9–11.

The undisputed testimony of these Indiana Gas employees further belies the proposition that they were motivated by a desire to penalize the plaintiff for having received short term disability benefits or to prevent her from obtaining such benefits in the future. For example, plaintiff's attorney Mr. King asked Mr. Roberts, "[W]ould it be a fair statement that the more numbers of disabilities an employee has the greater chance that they're going to be terminated by Indiana Gas?" To which, Mr. Roberts answered, "No. . . . I stated

more absenteeism. Again, key off the word disability. Absenteeism occurs for other reasons besides disability." Roberts Deposition, p. 41, lines 10–14, 16–18. Mr. King also questioned Mr. Horvath as follows:

Q The fact that [Sonja] was on disability in that time frame was taken into consideration for termination?

A The fact that she was off work, not the fact that there was a disability involved.

Q The fact that she was on disability and away from work, though, was taken into consideration?

A Away from work. I'll take the latter of your comment.

Horvath Deposition, p. 179, lines 13–22. Mr. King asked Ronald Shields, "[W]as that taken into consideration how many hours she was on short term disability for purposes of her termination?" Mr. Shields answered in part, "No. We consider a person's absent time record disregarding the cause of that record." Shields Deposition, p. 100, lines 3–8.

All of this testimony contradicts the plaintiff's assertion that "Defendant's own agents and officers make clear that Sonja was not terminated because she was absent, but because she was collecting short term disability payments." Plaintiff's Reply Brief, p. 7. The plaintiff cites the defendant's answer brief in support of this assertion. However, upon closer examination, the defendant's answer brief, on the cited page, states that "Sonja was terminated because she was absent—*not* because she was collecting short term disability benefits." Defendant's Response Brief, p. 5.

The plaintiff cites several sections of Kenneth Roberts' testimony in support of the proposition that if Sonja had not drawn disability benefits but instead had gone on sick leave without pay, then she would not have been fired. However, Mr. Roberts' testimony does not support this proposition. A discussion with regard to the sick leave without pay section of the Indiana Gas Organization and Policy Manual makes

it clear that because to Mr. Roberts' knowledge this sick leave has not been invoked before, he was testifying hypothetically. Roberts Deposition, p. 49. Moreover, while Mr. Roberts does seem to indicate hypothetically that an employee who took advantage of the sick leave without pay policy would not be fired for taking advantage of such leave, that does not establish that an employee with overall excessive absenteeism would be spared termination. Mr. Roberts' unequivocal testimony is that Sonja was not discharged for one incident of absence. He maintained that an examination of her record "was not done in a snapshot period. This was looked at over a period of years." Roberts Deposition, p. 148, lines 22–23. Again, in response to plaintiff's attorney J. Kevin King's question, "And essentially you don't like to pay for people that take too much disability; is that correct?", Mr. Roberts answered, "That is not correct." Roberts Deposition, p. 108, lines 1–2, 23.

The plaintiff cites a phrase apparently written by Frank Horvath on a draft of a termination letter for Sonja. The phrase was, "We need a reasonable." Mr. Horvath testified that he did not remember why this was written. Horvath Deposition, p. 150–151. The plaintiff argues that this demonstrates an effort on the part of Indiana Gas to come up with a pretext for discharging Sonja. Assuming that this phrase was written with regard to the reasons for terminating the plaintiff, it seems just as likely that any number of proper considerations could have motivated this statement. It would be pure speculation to conclude that the statement, "We need a reasonable", signified a desire to prevent Sonja from receiving benefits to which she might become entitled under ERISA.

Accordingly, the court determines that the plaintiff has failed to come up with evidence which would provide a basis for believing that Indiana Gas was motivated by a desire to prevent Sonja from exercising or receiving employee benefits protected under ERISA. The plaintiff's motion for partial summary judgment is therefore denied. Alternatively, had the plaintiff established a prima facie case, the court is of the view that the defendant came forward with a largely undisputed, legitimate explanation for the termination of the plaintiff, that is, excessive absenteeism. The plaintiff has not produced evidence with regard to the ERISA claim to suggest that the explanation was pretextual, as was done with the ADEA claim. The defendant's motion for summary judgment is therefore granted with respect to the ERISA count (Count I) of the plaintiff's complaint.

C. *Front and Back Pay After October, 1988*

The last issue before the court is the plaintiff's entitlement to front and back pay as a remedy under the ADEA claim which remains. There is no factual dispute between the parties concerning the events occurring after Sonja's discharge. Sonja was employed by G.W. Bartlett from May to October, 1988. In October, 1988, the plaintiff quit her job at G.W. Bartlett and moved with her new husband to Tennessee. Sonja lives six months out of the year in Tennessee and the remaining six months in Florida. She currently helps her retired husband restore cars.

■ The award of both front and back pay is conditioned upon a plaintiff's duty to mitigate. "As a general rule, a discriminatee is not entitled to backpay where he or she fails to make a good faith effort to find work." *Baggett v. Program Resources, Inc.*, 806 F.2d 178, 182 (8th Cir.1986). "[A] Title VII plaintiff cannot remain idle after an unlawful discharge and receive back pay for that period where he was not actively seeking employment." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir.1985) (citations omitted); *see also Walters v. City of Atlanta*, 803 F.2d 1135, 1145 (11th Cir.1986). Moreover, "[i]t is clear that front pay awards, like backpay awards, must be reduced by the amount plaintiff could earn using reasonable mitigation efforts." *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir.1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 785, 98 L.Ed.2d 870 (1988) (citation omitted); *see also Castle v. Sangamo Wes-*

*ton, Inc.*, 837 F.2d 1550, 1562 (11th Cir. 1988).

■ The plaintiff's testimony concerning her efforts to mitigate is clear. The defendant's attorney Mindy Dale questioned the plaintiff as follows:

Q. You left that job [at G.W. Bartlett] in October of '88?

A. Yes.

Q. Why did you leave?

A. I got married, and my husband lives in Tennessee.

Q. Did you seek employment after you moved to Tennessee?

A. My husband is retired, but he restores cars. I help him.

Q. So once you got to Tennessee, you didn't search for any employment outside of—

A. Outside of helping my husband in what he does, because with moving back and forth between Florida and Tennessee, it's really not feasible to maintain any kind of a regular job.

Sonja Kay Massie Deposition, p. 20, lines 8–23.

The defendant noted that when asked to provide records of her post-termination earnings, Sonja produced no records to show that she had received income from assisting her husband. Brief in Support of Defendant's Motion for Summary Judgment, p. 9, n. 1. Sonja's testimony indicates that she left her job at G.W. Bartlett to move to be with her new husband. Regardless of the reason for her move to Tennessee, what is relevant for purposes of the defendant's motion is the effort Sonja made to seek employment after she moved in October, 1988. Sonja testified that she resides in Florida and Tennessee, a lifestyle choice which she voluntarily made and which she believes has made the obtainment of a regular job infeasible. Sonja thus abandoned efforts to obtain employment after October, 1988, thereby breaching her duty to mitigate damages.

The defendant has correctly noted that a number of explanations offered by the plaintiff for her failure to mitigate do not have a bearing on the defendant's motion. The plaintiff argued that the defendant's failure to give Sonja a reference precluded her from finding a comparable job in Muncie, Indiana. However, as the defendant has argued, their motion for summary judgment does not challenge Sonja's efforts in Muncie but rather focuses on the lack of effort once the plaintiff had moved to Tennessee. Likewise, while the argument may be true that Sonja's duty to mitigate damages did not preclude her from leaving her job at G.W. Bartlett, it does not have a bearing on Sonja's actions in Tennessee. For the same reasons (and also because Sonja has testified that she does not intend to return to Muncie, Massie Deposition, pages 17–18), the defendant's failure to offer reemployment to the plaintiff is not relevant to the defendant's motion. The testimony of Dr. Owens, a psychologist who had counselled Sonja, likewise does not assist Sonja, as his testimony indicates that any psychologically deleterious effects of Sonja's termination would not have lasted beyond September, 1988. Owens Deposition, pages 71–72.

Sonja abandoned any efforts to seek employment after October, 1988, when she moved to Tennessee. Her failure to seek work is a breach of her duty to mitigate damages. *See Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2048, 68 L.Ed.2d 350 (1981). The plaintiff is therefore not entitled to front pay or back pay after October, 1988, and the defendant's motion for summary judgment is granted with respect to this issue.

### III. Conclusion

For the above reasons, the plaintiff's motion for partial summary judgment is granted with respect to Count II, the ADEA count, and denied with respect to Count I, the ERISA count. The defendant's motion for summary judgment is denied with respect to Count II, the ADEA count, but granted with respect to Count I, the ERISA count, and also with respect to the issue of front and back pay after October, 1988. The effect of these rulings is that the ADEA count survives for final

resolution at trial, and, if plaintiff prevails, her damages are limited to those incurred prior to November, 1988.