Tina M. **REINER,** Plaintiff,

v.

**FAMILY FORD, INCORPORATED,** a Florida Corporation, d/b/a Brandon Ford Incorporated, a Florida Corporation, Defendant.

No. 99–2719CIV–T–26.

United States District Court, M.D. Florida, Tampa Division.

May 15, 2001.

B. Elaine Jones & Associates (Elaine Jones, Mary B. Corn, of counsel), Bandon, FL, for Plaintiff.

Fisher & Phillips LLP (James C. Polkinghorn, Kristen L. Sampo, of counsel), Fort Lauderdale, FL, for Defendant.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge (Visiting).

### Introduction

Following a five day trial, on March 23, 2001, the jury rendered a verdict in this case brought pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.* and the Florida Civil Rights Act of 1992, Fla. Stat. Chs. 760.01–760.11.[1] In particular, the jury found that the plaintiff, Tina M. Reiner, had been retaliated against by defendant Family Ford, Inc., a Florida corporation, d/b/a Brandon Ford Inc., a Florida corporation ("Brandon Ford" or "Brandon"), for "engag[ing] in statutorily protected activity, that is, that she in good faith asserted claims or complaints of sexual harassment prohibited by federal and/or state law[,]" and that she sustained an adverse employment action, i.e., termination, as a result of engaging in such activity. *See* Doc. # 95 (Verdict Form at 4, ¶¶ 9 and 11). Thus, the jury awarded plaintiff $28,000.00 as compensation in back pay for her "net loss of wages and benefits to the date of trial[.]" *See id.* at 5, ¶ 12.

Among other things, plaintiff also sought front pay, but not reinstatement. *See* Complaint at 18, ¶ E. "[P]revailing Title VII plaintiffs are presumptively entitled to *either* reinstatement *or* front pay." *United States Equal Employment Opportunity Commission v. W & O, Inc.,* 213 F.3d 600, 619 (11th Cir.2000) (emphasis added) (internal quotation marks and citation omitted). In contrast to back pay, issues of front pay and reinstatement are "for the *trial judge,* and not the jury to decide." *Id.* at 618 (emphasis in original) (and cases cited therein). In accordance with this well-established legal principle, after the jury rendered its verdict, the court directed the plaintiff, if she chose to do so, to file a motion for front pay and it gave the defendant an opportunity to respond. After considering plaintiff Reiner's motion for said relief and Brandon Ford's opposition thereto, the court makes the following findings of fact and conclusions of law with respect to the front pay issue.

### Background

#### I. Evidence

After graduating from high school, plaintiff received an A.A.S. degree in automotive technology and she also received an automotive mechanic certificate. *See* Def. exh. 29A at 3. Pursuing a career in the automotive field, in September 1997, plaintiff Reiner became employed as a service advisor with Brandon Ford. As a service advisor, plaintiff's responsibilities consisted primarily of writing repair orders for customers' vehicles; answering questions and making recommendations regarding such repairs; at times making repair appointments; and arranging for client transportation during the time of repair. Her remuneration was in the form of weekly

---

1. Plaintiff Reiner's discrimination claims under the Florida statute mirror her Title VII claims. Because there is no discernible difference between those two statutes, hereinafter all references to Title VII shall be read as encompassing plaintiff's state based discrimination claims as well. *Cf. Bass v. Board of* *County Com'rs, Orange County,* 242 F.3d 996, 1009 n. 4 (11th Cir.2001) (internal quotation marks and citation omitted) ("decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act[ ]").

commissions based upon the amount of parts and labor she placed on customer repair orders.

Based upon her sales from January 1, 1999, until her termination for "insubordination" nearly midway through that year, on May 24, 1999, plaintiff testified that she was "on track" to earn approximately $56,000.00 in 1999. As her 1999 Brandon Ford W–2 reflects, however, plaintiff's earnings during the first five months of that year were only $18,007.14, thus seriously undermining her contention that her total earnings for that year from Brandon Ford would have be nearly $56,000.00. *See* Def. exh. 31.[2] In the preceding year, plaintiff's W–2 form indicates "wages, tips, [and] other compensation" from Brandon Ford in the amount of $41,254.21. *See* Def. exh. 32. In the first four months of her employment with Brandon Ford, in 1997, plaintiff's W–2 form states that she earned $12,295.69. *See* Def. exh. 33.[3] Besides salary, while at Brandon Ford plaintiff received benefits in the form of being enrolled in a 401(k) plan, and having medical coverage for herself and her children.

After her termination from Brandon Ford, plaintiff Reiner testified that she held several jobs. Plaintiff first became employed by Freedom Ford, where she worked in a position similar to that which she held at Brandon Ford. Plaintiff testified that Freedom Ford guaranteed her a salary of $4,000.00 per month during her first 90 days; thereafter she was to be paid on a commission basis. Unlike Brandon Ford, Freedom Ford had no fleet accounts. Fleet accounts are corporate accounts where a business has a contract with a particular dealership to have its entire fleet of vehicles serviced by that dealership. Evidently such accounts are relatively lucrative to service advisors such as Ms. Reiner.

Plaintiff stayed at Freedom Ford for only six weeks, candidly testifying that she voluntarily quit that job without notice when she was asked to work a weekend. She refused to work that weekend, because, as a single, divorced mother of two young children, she was unable to work then because the children were to be with her that weekend. Furthermore, plaintiff also refused to find a replacement for that weekend assignment, despite Freedom Ford's request that she do so.

After that short stint at Freedom Ford, plaintiff took a position as a service advisor with Lexus of Tampa Bay. There, plaintiff earned $50.00 per day, plus compensation based upon the number of technician or mechanic labor hours which she billed. Ms. Reiner was terminated during her 90 day probationary period at Lexus, however, because of "Absenteeism/Lateness[.]" *See* Def. exh. 29C. On her "Termination Report" from Lexus, another reason given for plaintiff's "separation" was that her "performance was below standard[.]" *Id.* Plaintiff did not dispute those reasons as is evidenced by her signature upon that report without comment. *See id.*

Next, plaintiff worked for Indian Motorcycles where she stayed for nearly six months, until August, 2000. While at Indian Motorcycles, she was paid on a strictly salary basis of $25,000.00 per year. Describing her departure from Indian Motorcycles as "pretty mutual," plaintiff explained that she left that job when her

---

**2.** Although the parties did not move for the admission of this document, it is part of the "source documents" to which plaintiff's economic consultant testified she relied upon in evaluating plaintiff's damages and copies of all of those documents were provided to the court.

**3.** This document too was among the source documents upon which plaintiff's economist relied.

salary was capped at $30,000.00. Prior to that, plaintiff testified that she had been making between $40,000.00 and $50,000.00 annually. The court observes that plaintiff's W–2 forms, as earlier described, belie this assertion. In only one of those years, 1998, did plaintiff earn more than $40,000.00; and there is nothing in the record showing that she ever earned over that $41,254.21 amount annually.

In any event, on cross-examination plaintiff was forced to concede that part of her decision to resign came from a disagreement she had with Indian Motorcycle's general manager. Plaintiff challenged the fact that he was reassigning some of her job responsibilities to one of her subordinates. Regardless of her motivation, what is clear from the record evidence is that for the second time after her termination from Brandon Ford, plaintiff voluntarily quit a job in her field where she was being compensated relatively well.

In September 2000, plaintiff took a job as a service advisor with Precision Toyota where she is still employed. At Precision Ford, plaintiff's base salary is $400.00 per week, plus a percentage of the service department profits. Although Precision Ford has a 401(k) program, plaintiff is not yet eligible to participate in it. Furthermore, unlike Brandon Ford, plaintiff must now pay for her own medical insurance. According to plaintiff, her current income level at Precision does not begin to approach what she was making at Brandon Ford, and she believes that she cannot achieve that level of income at Precision because of the difference in pay structures between the two dealerships. As another reason for the difference in earning capacity between Brandon Ford and Precision Toyota, plaintiff points to the fact that Precision has no fleet accounts. There was no concrete evidence, however, as to how these differences between the two dealerships directly impacted plaintiff in terms of her claimed discrepancy in earning potential.

In addition to plaintiff Reiner's testimony regarding her subsequent employment, an economic consultant, Joyce Eastridge, testified, *inter alia*, as to the amount of front pay to which she believes plaintiff is entitled. Relying on a number of source documents, including plaintiff's W–2 forms and her check stubs from 1997 forward, and making several assumptions, which will be set forth below, Ms. Eastridge offered two possible, alternative front pay scenarios. Under the first, Ms. Eastridge assumed that it would take five years for plaintiff to "close the gap," that is, for plaintiff to make as much at her current service advisor position at Precision Ford as she was making at the time of her termination from Brandon Ford. Assuming the following: (1) that plaintiff was unlawfully terminated from Brandon Ford and that she would have continued in Brandon's employ for five years from her termination date, and that she would have continued to earn $56,000.00 annually and to receive 401(k) contributions; (2) that she mitigated her damages by obtaining substantially similar alternative employment after her termination from Brandon; and (3) a 13% growth rate in plaintiff's earnings during the next five years, Ms. Eastridge opined that plaintiff sustained a cumulative total of $86,981 in front pay damages for that time frame. *See* Motion for Award of Front Pay ("Pl.Mtn.") and Memorandum of Law In Support ("Pl. Memo."), exh. "A" thereto. Alternatively, assuming that it would take plaintiff Reiner three years to close the earnings gap, Ms. Eastridge opined that plaintiff's total front pay damages then would be $57,248.00. *See id.*, exh. B thereto. In terms of lost back pay, based upon plaintiff's actual earnings up until March 5, 2001, Ms. Eastridge opined that plaintiff sustained $56,010.00 in such damages.

Brandon Ford did not refute Ms. Eastridge's methodology or calculations on cross-examination or by calling its own economic expert. Instead, Brandon Ford attempted to focus on the issue, which will be more fully discussed below, of plaintiff's duty to mitigate in terms of retaining subsequent employment. Brandon Ford did not, however, elicit from Ms. Eastridge any responses to support its theory that plaintiff failed to fulfill that obligation.

## II. Summary of Arguments

Relying upon the jury's finding that she was retaliated against in violation of Title VII, Ms. Reiner argues that she is entitled to front pay because she is a "victorious" plaintiff thereunder, and reinstatement is inappropriate given the evidence presented during trial of the acrimonious relationship between she and other Brandon Ford employees. *See* Pl. Memo. at 4. Furthermore a front pay award is necessary to make her whole, plaintiff Reiner contends. More specifically, plaintiff Reiner asserts that she was not made whole because "[t]he Jury took the back pay figure provided by Ms. Eastridge and split it down the middle." Pl. Mtn. at 2, ¶ 6. Thus, plaintiff is seeking "an award of front pay in the amount of $86,981.00 for five (5) years of front pay or alternatively, that the Court enter an award of front pay in the amount of $57,248.00 for three (3) years of front pay or somewhere in between these two figures." Pl. Memo. at 7.

Brandon Ford mounts a two-prong attack to plaintiff's front pay motion. First, it asserts that the court should deny such motion because plaintiff failed to mitigate her damages in that she voluntarily resigned from two of her subsequent jobs and was terminated from a third. Alternatively, Brandon Ford maintains that even if the court finds that plaintiff did mitigate her damages, still, the court must deny her front pay because it is speculative in "that there is no way to determine whether a gap in Reiner's earnings exists or how long it will take to close the gap." *See* Defendant's Memorandum in Opposition to Plaintiff's Motion for Award of Front Pay ("Def.Memo.") at 8. The court will consider each of these arguments in turn.

## *Discussion*

### I. Reinstatement v. Front Pay

In addition to authorizing the recovery of compensatory and punitive damages, Title VII broadly provides that a court may "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g). Given the broad equitable powers which Title VII vests in the courts, several remedies are available to a plaintiff who has shown a violation of that statute. *See International Bro. of Teamsters v. United States*, 431 U.S. 324, 364, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977) ("[T]he purpose of Congress in vesting broad equitable powers in Title VII courts was to make possible the fashion[ing][of] the most complete relief possible[.]") (internal quotation marks and citation omitted). Among those equitable remedies are reinstatement and front pay. Generally courts regard front pay as an alternative to reinstatement; it is not a cumulative remedy. *See Suggs v. ServiceMaster Education Food Management*, 72 F.3d 1228, 1234 (6th Cir.1996) (and cases cited therein); *but see Selgas v. American Airlines, Inc.*, 104 F.3d 9, 13 (1st Cir.1997) (reasoning that front pay and reinstatement are not mutually exclusive because "[f]ront pay takes a plaintiff to the point of employability[;] [r]einstatement at that point would, in effect, perfect the remedy because the plaintiff would be back in the very job she lost unlawfully[ ]") (internal quotation

marks omitted). Moreover reinstatement and not front pay is presumptively the "appropriate remedy in a wrongful discharge case." *See W & O, Inc., supra,* 213 F.3d at 619 (citation omitted); *see also Nord v. United States Steel Corp.,* 758 F.2d 1462, 1473 (11th Cir.1985) ("Title VII claimants are ... presumptively entitled to reinstatement under the make whole policy.") (internal quotation marks and citation omitted). Thus, although plaintiff Reiner is not seeking reinstatement, the fact that she is seeking front pay requires the court to decide in the first instance whether reinstatement is an option here. *See, e.g., W & O, Inc.,* 213 F.3d at 619 n. 12 (vacating and remanding a front pay award where the district could failed to offer *any* explanation for its decision to award front pay, and "requir[ing]" the district court to "*carefully articulate* its reasons for awarding front pay in lieu of reinstatement[ ]" and "*to make explicit findings* on this issue[ ]") (emphasis added) (internal quotation marks and citations omitted); *Nord,* 758 F.2d at 1473 (remanding "for the district court to either grant reinstatement or, if the court determines reinstatement is inappropriate, to set out the extraordinary circumstances ... which cause it to reach that conclusion[ ]") (footnote omitted).

The reinstatement inquiry need not detain this court for long. "Despite its widespread status as the 'preferred' remedy, virtually every circuit court of appeals has recognized that under certain circumstances reinstatement may be an inappropriate—if not an impracticable or impossible—remedy." *Ogden v. Wax Works, Inc.,* 29 F.Supp.2d 1003, 1008 (N.D.Iowa 1998), *aff'd on other grounds,* 214 F.3d 999 (8th Cir.2000) (citing *Duke v. Uniroyal, Inc.,* 928 F.2d 1413, 1423–24 (4th Cir.) (citing cases)). The Eleventh Circuit has recognized that "[i]n deciding whether to award front pay, rather than reinstatement, courts look to whether discord and antagonism between the parties would render

reinstatement ineffective as a make-whole remedy, ..., the defendant's management [had] intimidated or threatened the plaintiff, ..., or the termination had harmed the plaintiff's emotional well-being[.]" *W & O, Inc.,* 213 F.3d at 619 (internal quotation marks and citations omitted).

■ During the course of this trial, it was readily apparent that there is a high degree of animosity between plaintiff Reiner and certain individuals who remain employed at Brandon Ford. This animosity is mutual and, understandably, perhaps exacerbated by this litigation. In addition, it appears that there are essentially two "camps" of employees at Brandon Ford— those who are sympathetic to plaintiff Reiner and her sex discrimination claims, including her boyfriend who still is an employee there, and those who most decidedly are *not* sympathetic to plaintiff. In the court's view, given these two opposing factions, there is a very strong likelihood that plaintiff Reiner's reinstatement could arouse unnecessary hostility in the workplace, and indeed could well be counterproductive. Thus, as in *Fitzgerald v. Sirloin Stockade, Inc.,* 624 F.2d 945 (10th Cir. 1980), "[i]n view of the retaliatory action of the defendant, [as found by the jury,] it seems improbable that there [ever] could be a warm relationship[ ]" between Ms. Reiner and many of the defendant's current employees. *See id.* at 956.

Furthermore, although not dispositive, the court observes that there was no testimony of Brandon Ford's willingness to reinstate plaintiff. Nor did plaintiff Reiner testify as to whether she is ready, willing and able to return to Brandon Ford's employ, although in her front pay memorandum it mentions that reinstatement is not appropriate because of plaintiff's "complete inability ... to feel comfortable about communicating with the current owner/operator and comptroller." *See* Pl. Memo. at 4. Consequently, after having

considered all of the evidence presented at trial and after having an opportunity to observe first-hand not only plaintiff, but other Brandon Ford employees, including Paul Levine, Brandon Ford's president and general manager, the court is left with the firm conviction that reinstatement is not a viable remedy in this particular case. *Contra Hill v. Xerox Corporation*, 998 F.Supp. 1378 (N.D.Fla.1998) (reinstatement, not front pay, appropriate remedy where, among other reasons, employer was a large corporation with many positions available to plaintiff so he would not have to encounter the same people who had previously discriminated against him). Having found that reinstatement is not a viable remedy here, the court is now free to turn to the front pay issue which plaintiff Reiner's motion squarely presents.

## II.  Duty to Mitigate

■ Brandon Ford contends that plaintiff Reiner has forfeited her right to front pay "[b]ecause the jury *unequivocally determined* that [she] ... failed to mitigate her damages[.]" Def. Memo. at 6 (emphasis added) (citing *Ford Motor Co. v. Equal Employment Opportunity Commission*, 458 U.S. 219, 233–234, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 721 (1982); and *Sennello v. Reserve Life Ins. Co.*, 667 F.Supp. 1498, 1513–14 (S.D.Fla.1987), *aff'd on other grounds*, 872 F.2d 393 (11th Cir.1989)). As the party asserting this affirmative defense,[4] Brandon Ford bears the burden of proving this alleged failure to mitigate. *See Hipp*, 29 F.Supp.2d at 1322 ("Defendant bears the burden of proving failure to mitigate damages."); *see also E.E.O.C. v. Joe's Stone Crab, Inc.*, 15 F.Supp.2d 1364, 1378 (S.D.Fla.1998) (citation omitted) (same).   To meet this burden ordinarily a defendant "must show that a claimant did not make reasonable efforts to obtain comparable work, or that comparable work was available and the claimant did not seek it out." *Joe's Stone Crab*, 15 F.Supp.2d at 1378 (citation omitted). "Once comparable substitute employment has been found, ..., the title VII claimant faces certain obligations vis-a-vis the retention of that employment; namely, the [she] must make 'reasonable and good faith efforts' to retain the job." *Sennello*, 667 F.Supp. at 1513 (quoting *Brady v. Thurston Motor Lines*, 753 1269, 1277 (4th Cir.1985)).

Before delving too far into Brandon Ford's duty to mitigate argument, the court has two observations.   First of all, despite how Brandon Ford depicts it, the jury did not "unequivocally" find that plaintiff Reiner failed to mitigate her damages.   Indeed, although the jury was instructed as to the duty to mitigate,[5] it was not given a specific interrogatory on that issue.   Rather, in pertinent part, the jury was simply asked whether it found "from a preponderance of the evidence that Ms. Reiner should be awarded damages to compensate for a net loss of wages and benefits to the date of trial[.]"   Verdict Form at 5, ¶ 12.   The jury responded in the affirmative, awarding plaintiff $28,000.00 for such damages. *See id.*

Given, as previously mentioned, that plaintiff's economist opined that plaintiff is

---

4.  *See Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1347 (11th Cir.2000) ("The failure to mitigate one's damages is an affirmative defense[.]").

5.  In that regard, the jury was instructed as follows:

 [I]f you should find from a preponderance of the evidence that Ms. Reiner failed to seek out or take advantage of a business or employment opportunity that was reasonably available under all the circumstances shown by the evidence, then you should reduce the amount of Ms. Reiner's damages by the amount that could have been reasonably realized if Ms. Reiner had taken advantage of such opportunity.

entitled to roughly $56,000.00 in back pay, coupled with the fact that the jury awarded her exactly half that amount, it is possible to infer that the jury believed that plaintiff did not fully mitigate her damages. In light of that reduction in back pay, evidently the jury was not convinced that plaintiff Reiner mitigated her damages inasmuch as she voluntarily resigned from two jobs subsequent to Brandon Ford and was forced to resign from another. The fact remains, however, that the foregoing is only an interpretation of the jury's verdict; it is not, as Brandon Ford urges, an express finding by the jury.

Not only did Brandon Ford mischaracterize the facts in terms of the jury's findings, but it was equally careless as to its statement of the relevant law. Brandon Ford is taking the position that plaintiff's "failure to mitigate *bars* her claim for front pay[,]" yet none of the cases it cites to support that bald assertion address the duty to mitigate in the context of front pay. *See* Def. Memo. at 6 (emphasis added). Without exception, every case which Brandon Ford cites in that particular section of its opposition memorandum involved the duty to mitigate in the context of *back*, not front, pay. More importantly, however, is the fact that not one of those cases supports the proposition which Brandon Ford advances, i.e., a failure to mitigate completely forecloses a back pay award, let alone that such a failure completely forecloses a front pay award. Indeed, the only somewhat relevant case which Brandon Ford cites in this regard is a case from the Sixth Circuit—*Suggs*, 72 F.3d 1228—and according to that Court a plaintiff's obligation to mitigate her damages is but one of a number of factors relevant to a front pay award. *See id.* at 1234 (citation omitted). There is no mention in *Suggs* of a plaintiff's failure to mitigate as foreclosing altogether a front pay award.

■ Nonetheless, although Brandon Ford overlooked it, the Eleventh Circuit has held that "[t]he duty to mitigate damages by seeking employment elsewhere will, ..., *limit* the *amount* of *front pay* available." *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir.1988) (emphasis added) (citation omitted); *see also Massie v. Indiana Gas Co.*, 752 F.Supp. 261, 271 (S.D.Ind.1990) ("'It is clear that *front pay awards,* like backpay [sic] awards, must be *reduced* by the amount plaintiff could earn using reasonable mitigation efforts.'") (other citation omitted) (quoting *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir.1987)). Regardless of whether the duty to mitigate arises in the context of front pay or back pay, its essential elements are the same. A plaintiff-employee "must mitigate her damages by seeking employment 'substantially equivalent' to the position [from which] she was [terminated]." *See Joe's Stone Crab,* 15 F.Supp.2d at 1378 (S.D.Fla.1998) (citing *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1526 (11th Cir.1991)). Plaintiff Reiner counters that she "has continuously mitigated her damages" Pl. Memo. at 6, in that after her termination she obtained employment "*somewhat comparable* [,]" but "not *completely comparable*" to the position which she held at Brandon Ford. *See* Pl. Mtn. at 2, ¶3 (emphasis added).

■ Brandon Ford is not challenging the comparability of plaintiff's various post-termination jobs to her Brandon Ford job. Therefore, although the record is admittedly scant in this respect, the court will assume, as Brandon Ford has, that plaintiff Reiner's subsequent positions were "substantially equivalent" in that those jobs "'afford[ed] virtually identical promotional opportunities, compensation, jobs responsibilities, [and] working conditions,'" as her previous position with

Brandon Ford. *See Joe's Stone Crab*, 15 F.Supp.2d at 1378 (quoting *Weaver*, 922 F.2d at 1527). Assuming this substantial equivalency, the issue, as defined by Brandon Ford's mitigation argument, is whether plaintiff Reiner fulfilled her obligation to mitigate by "mak[ing] 'reasonable and good faith efforts' to *retain* [subsequent] job[s]." *See Sennello*, 667 F.Supp. at 1513 (quoting *Brady*, 753 F.2d at 1277) (emphasis added). In terms of job retention, courts have recognized that " 'a claimant who voluntarily quits comparable, interim employment fails to exercise reasonable diligence in the mitigation of damages[,]' " and as such damages must be "decreased by the amount [s]he would have earned had [s]he not quit.' " *Id.* (quoting *Brady*, 753 F.2d at 1277 and 1273) (other citations omitted); *see also Barbour v. Medlantic Management Corp.*, 952 F.Supp. 857, 864 (D.D.C.), *aff'd without pub'd opinion*, 132 F.3d 1480 (D.C.Cir.1997) ("By voluntarily quitting suitable employment for personal reasons, [plaintiff] failed to exercise reasonable diligence.") Such a reduction is not unqualified though. Voluntary termination of interim employment "should only be reduced if the claimant lacked 'compelling or justifying reasons' for having quit the job." *Sennello*, 667 F.Supp. at 1514 (quoting *Brady*, 753 F.2d at 1278) (other citation omitted).

Applying the foregoing principles to the present case, it is apparent, as plaintiff Reiner readily conceded, that she voluntarily quit interim employment not once but twice. Moreover, as detailed above, she was terminated from another job for absenteeism and substandard performance. Thus, the relevant proof convinces the court that plaintiff did not mitigate her damages.

While the court is sympathetic to difficulties which Ms. Reiner may have had in retaining subsequent employment due in part perhaps to child care issues, that does not excuse her duty to mitigate. At Freedom Ford, instead of working a given weekend, she was told that she could find a replacement, but plaintiff refused to do that, believing that finding a substitute employee was not her responsibility. Obviously, then, plaintiff did nothing to help herself in terms of this particular scheduling conflict. Likewise, even though the court understands that at least some of plaintiff's absenteeism during her tenure at Lexus was due to illness—both plaintiff's and her children's—the fact remains that an employer is entitled to expect a dependable employee. Finally, quitting Indian Motorcycles because she was displeased with a change in the division of labor does not constitute a "compelling or justifying reason" for leaving that job, especially when her earnings there were relatively commensurate with her prior earnings. In short, based upon the entire record before it, the court finds that because plaintiff voluntarily quit comparable employment on two separate occasions, without compelling or justifying reasons, and because she was terminated from another job for absenteeism and substandard performance, she did *not* exercise reasonable diligence in mitigating her damages through maintaining interim employment.

### III. Egregious Conduct

There is an additional obstacle to plaintiff's request for front pay—a basis which quite frankly Brandon Ford should have raised but did not. Characterizing front pay as "a special remedy," *Lewis v. Federal Prison Industries, Inc.*, 953 F.2d 1277, 1281 (11th Cir.1992), the Eleventh Circuit has held that such relief is "warranted *only* by egregious circumstances." *See Eskra v. Provident Life and Acc. Ins. Co.*, 125 F.3d 1406, 1417 n. 50 (11th Cir. 1997) (citing *Lewis*, 953 F.2d at 1281) (emphasis added). Brandon Ford's failure to bring to the court's attention this egre-

gious conduct element of a front pay award is particularly glaring given its reliance upon *Lewis*, albeit for a different proposition.

In *Eskra*, the district court denied the plaintiff-employee's front pay claim. When plaintiff cross-appealed, the defendant-employer argued that "because the jury did not find 'egregious circumstances' ..., he [wa]s not entitled to 'front pay.'" *See id.* at 1417. The Eleventh Circuit agreed, "[a]cknowledging that front pay is warranted *only* in egregious circumstances under *Lewis*," and "explain[ing] that plaintiff failed to prove that defendant had acted with 'reckless disregard' in connection with the defendant's discriminatory conduct." *See Hipp v. Liberty National Life Insurance Co.*, 29 F.Supp.2d 1314, 1321 (M.D.Fla.1998) (citing *Eskra*, 125 F.3d at 1417–18) (emphasis added). In contrast to *Eskra*, in *Hipp* the court found that plaintiffs *were* entitled to front pay because the jury expressly "found that [p]laintiffs proved 'by a preponderance of the evidence that Liberty National's conduct toward [Plaintiffs] was done with knowledge that it was a violation of the Age Discrimination in Employment Act or with reckless disregard as to whether it was a violation of th[at] ... Act[.]'" [6] *Id.*

As in *Eskra*, in the present case there was no showing of egregious circumstances. In fact, the jury found to the contrary. When asked whether it found "from a preponderance of the evidence that a higher management official of Brandon Ford acted with malice or reckless indifference to Ms. Reiner's federally and/or state protected rights[,]" the jury

responded in the negative. *See* Verdict Form at 5, ¶ 14. Thus, the absence of a finding of egregious circumstances, coupled with plaintiff Reiner's failure to mitigate her damages, compels the court to deny her claim for front pay herein.

## IV. Speculative

Having found that plaintiff Reiner is not entitled to front pay because she did not mitigate her damages and because she did not show the requisite egregious circumstances, there is no need to address Brandon Ford's alternative argument that front pay should be denied because plaintiff's claim in this regard is too speculative. Without ruling on the speculative nature of plaintiff's front pay claim, the court observes however that it finds troubling two assumptions by plaintiff's economist on this issue. The first is her assumption that plaintiff Reiner would have earned $56,000.00 had she remained employed at Brandon Ford throughout 1999. The second is Ms. Eastridge's further assumption that plaintiff would have continued to earn that amount in the following five years. Given the state of the record, those assumptions are, in the court's view, strained. As previously explained, there is simply no hard data to support these assumptions of such an earning capacity by plaintiff Reiner. Moreover, given plaintiff's W–2s, the more likely assumption is to the contrary: Plaintiff's earnings would have been lower, perhaps substantially so, than the wholly unsupported, projected amount of $56,000.00.

By the same token, however, the court is fully cognizant that inherent in any award of prospective relief, such as

---

**6.** The court is fully aware that *Hipp* was an ADEA case and not a Title VII case, but that is a distinction without a difference, at least for purposes of the present analysis. *See Stanfield v. Answering Service, Inc.*, 867 F.2d 1290, 1296 (11th Cir.1989) ("Although the *Ford* decision addressed the duty to mitigate

damages under Title VII, it is instructive as a guide in interpreting the same duty under the ADEA."); *Maleszewski v. U.S.*, 827 F.Supp. 1553, 1556 (N.D.Fla.1993) ("[T]he relief available to a successful ADEA claimant is essentially the same as that afforded Title VII claimants[.]").

front pay, is "some risk of uncertainty[.]" *See Munoz*, 223 F.3d at 1349 (internal quotation marks and citation omitted). That risk does not in and of itself preclude front pay, but such an award is "not intended to insure a plaintiff's future financial success." *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1371 (7th Cir. 1992). Although "[t]he speculative nature of … front pay … does not completely foreclose" such an award, *see Hipp*, 29 F.Supp.2d at 1321, in the present case, the speculative nature of plaintiff's front pay proof, in combination with the other factors already discussed, i.e., failing to mitigate and lack of egregious circumstances, convinces the court that plaintiff Reiner is not entitled to an award of front pay.

To conclude, for all of the reasons set forth herein, the court hereby DENIES plaintiff Tina M. Reiner's motion for front pay. The Clerk of the Court is directed to enter judgment accordingly, also reflecting the jury's verdict of March 23, 2001.

IT IS SO ORDERED.