**David HIPP, Harry W. McKown, Jr., Brad Stein, Mike Stell, and All Others Similarly Situated, Plaintiffs,**

v.

**LIBERTY NATIONAL LIFE INSURANCE COMPANY, Defendants.**

**No. 95–1332–CIV–17A.**

United States District Court, M.D. Florida, Tampa Division.

Nov. 20, 1998.

---

Ross Mathew Goodman, Robert Douglas Permenter, Troy Alan Rafferty, Mary E. Pilcher, Levin, Middlebrooks, Thomas, Mitchell, Green, Eschner, Proctor & Papantonio, Pensacola, FL, for Plaintiffs.

Peter W. Zinober, D. Michael Pointer, II, Zinober & McCrea, P.A., Tampa, Margaret H. Campbell, Martha C. Perrin, Ogletree, Deakins, Nash, Smoak & Stewart, Atlanta, GA, William J. Baxley, Joel E. Dillard, Baxley, Dillard, Dauphin & McKnight, P.A., Birmingham, for Defendant.

### *ORDER*

KOVACHEVICH, Chief Judge.

This cause comes before the Court on Plaintiffs' Memorandum in Support of Front Pay and Punitive Damage Awards Consistent with the Jury's Verdict (Docket No. 322), Defendant's Response to Plaintiffs' Memorandum Regarding Front Pay and Punitive Damages (Docket No. 328), Defendant's Memorandum Regarding Front Pay and Punitive Damages (Docket No. 323), and Plaintiffs' Response to Defendant's Brief Regarding Front Pay and Punitive Damages (Docket No. 332).

On July 9, 1998, the jury returned verdicts in this cause which included front pay advisory awards to five (5) Plaintiffs: Tony Agee, Harold Carter, Jimmy Lee, Mike Stell, and Blake Tuggle. In addition, the jury awarded $5 million in punitive damages each to David Hipp and Brad Stein, both of whom, were Florida Plaintiffs. After the Court received

the verdicts, the parties were directed to file briefs regarding the front pay and punitive damages awards.

The following awards were returned by the jury:

| PLAINTIFF | BACK PAY | FRONT PAY (ADVISORY) | PUNITIVE | PAIN & SUFFERING |
|---|---|---|---|---|
| Tony Agee | $191,043 | $537,016 | | |
| Harold Carter | $227,465 | $994,642 | | |
| Don Ganus | $ 0 | $ 0 | | |
| David Hipp | $337,592 | $ 0 | $5M | $1.175M |
| James Lee | $673,819 | $616,851 | | |
| Dwayne Sentell | $ 0 | $ 0 | | |
| Brad Stein | $403,779 | $ 0 | $5M | $2.7M |
| Mike Stell | $196,390 | $546,952 | | |
| Peter Swanson | $ 0 | $ 0 | | |
| Blake Tuggle | $ 79,742 | $490,227 | | |

## I. *Reinstatement vs. Front Pay*

■ As a preliminary argument, Defendant contends that, because reinstatement is the preferred remedy for discrimination under the ADEA, reinstatement should be ordered, rather than front pay awarded. Defendant argues that it is Plaintiffs' burden to prove, by specific evidence, that reinstatement is "unworkable due to hostility, harassment, or retaliation." (Def.'s Mem. p. 2)(citing *James v. Sears, Roebuck & Co.*, 21 F.3d 989, 997 (10th Cir.1994)). Moreover, Defendant asserts that the reinstatement remedy should not be summarily disregarded or considered impracticable simply because a plaintiff contends that past discrimination, and the resulting litigation, engendered ill feelings between himself and his former employer.

Conversely, Plaintiffs point out that Vurl Duce, Defendant's Executive Vice president, is responsible for the work assignments and supervision of all District Managers; therefore, reinstatement of Plaintiffs would place them subject to Mr. Duce's supervision. Plaintiffs argue that Mr. Duce received numerous complaints of discrimination from Plaintiffs and he failed to either report the complaints or insure that appropriate action was initiated. Plaintiffs assert that the evidence presented at trial demonstrates that Mr. Duce, as well as other management employees, including, but not limited to, Patti Herring, Jim Poole, and Dale Rainey, all received complaints of discrimination and failed to take appropriate corrective action. Plaintiffs maintain that this inexcusable neglect of their affirmative duties and responsibilities to prevent discrimination in the workplace establishes that reinstatement is not an appropriate remedy. Moreover, Plaintiffs contend that Defendant's policies are still established and enforced by C.B. Hudson whose policies were at the center of this litigation. Plaintiffs emphasize that C.B. Hudson's policies evidenced a pattern and practice of age discrimination.

Plaintiffs also take issue with Defendant's characterization that Defendant's workplace has been cleansed of the individuals who were primarily responsible for the intimidation and harassment they suffered. Plaintiffs argue that Andy King, Defendant's former Vice President, who predominantly carried out the harassment, was promoted to a sister company despite all of the complaints and allegations of discrimination against him. Plaintiffs assert that these facts suggest that the pattern and practice of discrimination has not ceased. Furthermore, Plaintiffs assert that Defendant has failed to acknowledge the pattern and practice of age discrimination or the fact that those proven to be responsible for the discrimination continue to have control and ultimate responsibility of the company.

■ In *Lewis v. Federal Prison Industries, Inc.*, 953 F.2d 1277 (11th Cir.1992), the Eleventh Circuit evaluated the circumstances under which front pay is appropriate. "Front pay may be particularly appropriate in lieu of restatement where discord and antagonism between the parties would render reinstatement ineffective as a make whole remedy." *Id.* 953 F.2d at 1280 (quot-

ing *Goldstein v. Manhattan Industries,* 758 F.2d 1435, 1449 (11th Cir.1985)). The *Lewis* Court noted that front pay is favored over reinstatement where the employer intimidated or threatened the plaintiff and where the plaintiff's self worth was crushed by the dismissal. *Id.*

The Court agrees with Plaintiffs. It is not reasonable to assume that any of the Plaintiffs could productively return to their former positions with Defendant. During the trial, Defendant attacked the character and abilities of each of the Plaintiffs in order to show that each one was fired because he was incapable of meeting the demands of the job. Moreover, Plaintiffs' entire case was dependent on the theory that Defendant employed a pattern and practice of age discrimination involving harassment and intimidation in order to force the older employees to leave in an effort to reduce expenses. The factors recognized by the Eleventh Circuit as warranting front pay are present in this case.

A prime example of the impracticality of reinstatement is Plaintiff Stell's circumstances. Although Defendant has not admitted that any of the Plaintiffs were discriminated against, Defendant conceded that Plaintiff Stell's termination was unfortunate and argued that the company did everything in its power to persuade Plaintiff Stell to return to work for Defendant. As a result, Plaintiff Stell presents the only individual situation where it is at least arguable that reinstatement is a possibility. Nevertheless, Defendant's argument has little merit.

Although Defendant presented evidence that Plaintiff Stell was asked to return to his position, there was contradictory evidence presented which indicated that the offer was not unconditional and Defendant did not attempt to resolve the problems, of which, Plaintiff Stell complained. Interestingly, Plaintiff Stell testified that he was harassed, not merely because of his age, but also because of his weight. Plaintiff Stell testified that the stress of the harassment caused him emotional and psychological problems. He also testified that his physical ailments required hospitalization. Furthermore, other Plaintiffs testified that the offers made by

Defendant were unacceptable and there was no evidence produced which would suggest that their respective refusals were unreasonable.

This Court noted in its previous Order (Docket No. 287) that the evidence produced at trial revealed that Defendant capitalized on the vulnerabilities of these Plaintiffs and caused several of them to seek medical and psychiatric help. The relationship between the employer and employee has been clearly severed in this case. The evidence at trial established that the admiration and esteem that Plaintiffs once held for Defendant has long been extinguished by Defendant's acts. It is too late to paint a promising picture of employment opportunities.

Moreover, there is no indication that Defendant has District Manager positions open for each of these Plaintiffs. Each Plaintiff would have to be reinstated in the same position he would have held had he not been illegally terminated. As a result, Plaintiffs would have to be placed in the same districts with the same pay structure and benefits that they had prior to being terminated. Interestingly, some of the Plaintiffs established that they replaced one another in the same District Manager position and were forced to leave the company sequently. Reinstatement is not a viable remedy in this case.

Consequently, where reinstatement is not feasible, a plaintiff must be awarded reasonable, offsetting compensation. *See Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728 (2d Cir.1984). To hold otherwise "would leave the plaintiff irreparably harmed in the future by the employer's discriminatory discharge, and would permit the defendant's liability for its unlawful action to end at the time of judgment." *Id.*

Nevertheless, Defendant argues that, even if reinstatement is not appropriate, Plaintiffs still should not be awarded front pay. Defendant offers three (3) reasons why Plaintiffs should not be awarded front pay: (1) Plaintiffs who were awarded liquidated damages are not entitled to front pay; (2) the jury's front pay awards are unduly specula-

tive; and (3) front pay should be awarded only in egregious circumstances.

Defendant argues that, because the jury found that Defendant willfully violated the ADEA, Plaintiffs will be entitled, as a matter of law, to liquidated damages in an amount matching the jury's back pay award. However, Defendant argues that, when an age discrimination Plaintiff receives a substantial liquidated damage award, federal courts commonly consider it inappropriate or excessive to additionally award front pay. *See Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir.1992); *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir.1990); *Wildman v. Lerner Stores, Corp.*, 771 F.2d 605, 616 (1st Cir.1985); *Shove v. E.J. Prescott, Inc.*, 65 FEP Cases (BNA) 96, 97 (D.Me.1994). Defendant argues that awards of both liquidated damages and front pay to Plaintiffs Agee, Carter, Lee, Stell, and Tuggle would constitute a windfall.

Interestingly, Defendant also argues that Plaintiffs' entitlement to liquidated damages precludes an award of punitive damages. Consequently, Defendant argues that the individual Plaintiffs who are entitled to liquidated damages can only recover back pay and liquidated damages. In other words, the liquidated damages award would replace *both* the punitive damages award and the front pay award.

## II. *Liquidated Damages*

(1) *Liquidated Damages Do Not Preclude Front Pay Awards*

▓ Although the First, Fifth, and Seventh Circuits have indicated that the trial court must consider any existing award of liquidated or punitive damages in making its determination of front pay, and, that a substantial award may render front pay inappropriate or excessive, a more sound analysis comes from the Supreme Court of Tennessee.[1] In *Coffey v. Fayette Tubular Products*,

929 S.W.2d 326 (Tenn.1996), the Tennessee Supreme Court analyzed the relationship between compensatory and punitive damages and pointed out the deficiencies in the circuit courts' reasoning. The *Coffey* Court noted that typically, the reasonableness of a punitive damage award is evaluated based on the correlation of the award to the harm suffered by the plaintiff. *Id.* 929 S.W.2d at 332 (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 1600-03, 134 L.Ed.2d 809 (1996)). However, "the reasonableness of a compensatory award, the jury's valuation of the plaintiff's harm, is never tested by its relationship to the punitive award." *Id.* 929 S.W.2d at 332-33. The explanation is that a "defendant's actions may have been relatively blameless and worthy of little or no punitive response from the jury, and yet the plaintiff may have suffered a large amount of economic damages; on the other hand, the defendant's actions may have been particularly egregious and worthy of a substantial punitive response, yet the plaintiff may have suffered only a small amount of economic damages." *Id.* 929 S.W.2d at 333 (citing *BMW of North America, Inc., v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 1602, 134 L.Ed.2d 809 (1996)).

Because the determination of future damages has no necessary relationship to the determination of punitive damages, the reasoning used by the First, Fifth, and Seventh Circuits is flawed. *Id.* Moreover, the assessment of front pay is compensatory, it is not intended to punish or deter a defendant, but rather, to make the victims of discrimination whole again. Consequently, the amount valuated by the trier of fact to compensate Plaintiffs for their future injuries should not be dependent on the amount the legislature or the jury has determined is necessary to punish and deter Defendant.[2]

---

1. *See Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 616 (1st Cir.1985); *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir.1992); *Tennes v. Commonwealth of Massachusetts, Department of Revenue*, 944 F.2d 372, 381 (7th Cir.1991).

2. The reverse is also true. The amount valuated by the jury to punish a defendant should not be

dependent on the amount needed to fully compensate a plaintiff either. If front pay, which is compensatory, is somehow linked to the jury's assessment of punitive damages, then this case would require a result which has not been considered by other courts. For instance, the jury awarded Plaintiffs Brad Stein and David Hipp

■ Significantly, the Eleventh Circuit has already confronted this issue. "A district court may not factor in the liquidated damages award when considering equitable relief because liquidated damages are punitive in nature." *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir.1988)(explaining the difference between punitive damages and compensatory damages and that "[l]iquidated damages are not meant to replace equitable relief under the ADEA."). The Eleventh Circuit in *Castle* found that the district court had mistakenly relied on the First Circuit's opinion in *Wildman v. Lerner Stores Corp.*, 771 F.2d 605 (1st Cir.1985), cited by Defendant, and reversed the district court's grant of the judgment notwithstanding the verdict. *See Id.; Castle v. Sangamo Weston, Inc.*, 650 F.Supp. 252, 258 (M.D.Fla. 1986). Defendant's argument that Plaintiffs' receipt of punitive damages, in whatever form, precludes the recovery of front pay, is not supportable.

(2) *Liquidated Damages Precludes An Award of Punitive Damages*

■ While it is clear that an award of liquidated damages does not preclude (or even affect) an award of front pay, an award of liquidated damages under the ADEA, in addition to, an award of punitive damages under the Florida Civil Rights Act would, indeed, amount to double recovery. "[T]here can be no doubt that to allow a prevailing plaintiff to recover both liquidated damages under the ADEA, and punitive damages under the FRCA, constitutes double recovery and is therefore impermissible." *Moses v. K–Mart Corp.*, 905 F.Supp. 1054, 1059 (S.D.Fla.1995). Consequently, Defendant argues that because liquidated damages are punitive in nature, Plaintiffs Stein and Hipp cannot be awarded both liquidated damages and punitive damages.

In *Moses*, the district court held that once a jury finds a willful violation of the ADEA, an award of liquidated damages under the statute becomes mandatory, and the Court is obligated to strike the jury's award of punitive damages and remit the full amount. *Id.; See also Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1561 (11th Cir.1988) ("The district court no longer has discretion to reduce the amount of liquidated damages."). Other courts have also followed this line of reasoning and have held that, under the ADEA, courts have no discretionary authority to reduce liquidated damages. *See Ryther v. Kare 11*, 864 F.Supp. 1525, 1529 (D.Minn. 1994); *Lee v. Rapid City Area School Dist.*, 981 F.2d 316, 333 (8th Cir.1992); *Spanier v. Morrison's Management Services, Inc.*, 822 F.2d 975, 979 (11th Cir.1987). Consequently, a plaintiff is not entitled to any form of punitive damages beyond liquidated damages. *See Hannon v. Continental National Bank*, 427 F.Supp. 215, 218 (D.Colo.1977) (explaining that, "the provision for liquidated damages operates as a penalty, and is a legislative substitute for any type of punitive damages").

Significantly, Plaintiffs failed to address Defendant's argument and the Court finds that Plaintiffs Stein and Hipp cannot recover punitive damages because of the mandatory award of liquidated damages under the ADEA. "Given that Plaintiffs may not recover both punitive and liquidated damages, coupled with the fact that liquidated damages are mandatory [under the ADEA], the Court sees no other course than to strike the jury's award of punitive damages and remit the full amount." *Moses*, 905 F.Supp. at 1059. Consequently, Plaintiffs Stein and Hipp's punitive awards of $5M each must be remitted to $0. Accordingly, Plaintiffs are entitled to the following awards, pursuant to the jury's verdicts:

| PLAINTIFF | BACK PAY | LIQUIDATED DAMAGES | PUNITIVE | PAIN & SUFFERING |
|---|---|---|---|---|
| Tony Agee | $191,043 | $191,043 | | |
| Harold Carter | $227,465 | $227,465 | | |
| Don Ganus | $ 0 | $ 0 | | |

$5M each in punitive damages each. Since Defendant argues that these awards must be reduced because Plaintiffs are only entitled to liquidated damages, surely the Court's determination of front pay, under the circuit's reasoning, must account for these drastic reductions and be adjusted accordingly. After all, equity regards as done what ought to have been done.

| PLAINTIFF | BACK PAY | LIQUIDATED DAMAGES | PUNITIVE | PAIN & SUFFERING |
|---|---|---|---|---|
| David Hipp | $337,592 | $337,592 | $0 | $1.175M |
| James Lee | $673,819 | $673,819 | | |
| Dwayne Sentell | $    0 | $    0 | | |
| Brad Stein | $403,779 | $403,779 | $0 | $2.7M |
| Mike Stell | $196,390 | $196,390 | | |
| Peter Swanson | $    0 | $    0 | | |
| Blake Tuggle | $ 79,742 | $ 79,742 | | |

### III. Front Pay

#### (1) Speculative Nature of Front Pay Awards

■ There is no doubt that future damages are inherently speculative. However, "the speculative nature of the front pay remedy carries just as much potential to short-change the plaintiff as it does to grant a windfall. The speculativeness of the remedy is a double-edged sword and is not cured by a mechanism that only allows adjustment in one direction." Coffey v. Fayette Tubular Products, 929 S.W.2d 326, 333 (Tenn.1996). Moreover, Defendant "should not be heard to complain of uncertainty when that uncertainty has been caused by its own acts." Buckley v. Reynolds Metals Co., 690 F.Supp. 211, 216 (S.D.N.Y.1988).

■ Although the Court declines to preclude the award of front pay based solely on an award of liquidated damages, Plaintiffs are not entitled to unreasonable and excessive awards that compensate them for the remainder of their working lives. The issue is whether a front pay award is necessary to make Plaintiffs whole. Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1529 (11th Cir. 1991). Any "monetary award of front pay [should be] calculated to terminate on the date a victim of discrimination attains an opportunity to move to his 'rightful place.'" Id. The speculative nature of a front pay award certainly factors into the computations; however, it does not completely foreclose such an award.

#### (2) Front Pay Award Requires Egregious Circumstances

■ Defendant argues that front pay should only be awarded in egregious circumstances and that none of the individual Plaintiffs can satisfy the heavy burden of showing egregious discriminatory conduct. Conversely, Plaintiffs argue that egregiousness can be inferred when the employer acts with reckless disregard to the established law under the ADEA. Plaintiffs contend that because the jury found that Defendant's conduct was done with knowledge that it was a violation of the ADEA or with reckless disregard as to whether it was a violation, front pay should be considered an appropriate remedy in this case.

In Eskra v. Provident Life and Accident Ins. Co., 125 F.3d 1406 (11th Cir.1997), the employee/plaintiff cross-appealed the district court's denial of his claim for front pay. Id. 125 F.3d at 1417. The defendant responded by arguing that because the jury did not find "egregious circumstances" under the ADEA, plaintiff was not entitled to front pay. Id. After acknowledging that front pay is warranted only in egregious circumstances under Lewis, the Eleventh Circuit explained that plaintiff failed to prove that defendant had acted with "reckless disregard" in connection with the defendant's discriminatory conduct. Id. 125 F.3d at 1417–18. The Eskra Court explained that, although the jury decided that the defendant's actions violated the ADEA, plaintiff had not proven reckless disregard. Id. 125 F.3d at 1418. As a result, front pay was not appropriate.

Conversely, in the case at hand, the jury found that Plaintiffs proved "by a preponderance of the evidence that Liberty National's conduct toward [Plaintiffs] was done with knowledge that it was a violation of the Age Discrimination in Employment Act or with reckless disregard as to whether it was a violation of the Age Discrimination in Employment Act[.]" Moreover, the jury's punitive damages awards speak volumes with regard to the egregious conduct proven at trial. The Court finds that Plaintiffs are entitled to awards of front pay.

Nevertheless, as noted above, Plaintiffs are not entitled to be subsidized for the remain-

der of their working lives. There was no evidence presented at trial which would establish that Plaintiffs had no prospect of obtaining comparable alternative employment with comparable earnings for the rest of their working lives. The Court must fashion a remedy that, as a whole, achieves the remedial purposes of the ADEA. *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1529 (11th Cir.1991).

### (3) *Calculating Font Pay*

■ There are many factors to be considered when making a determination of an equitable front pay award. Comparison of salaries alone is not determinative of whether the entire employment benefit package at a new position is comparable. *See Buckley v. Reynolds Metals Co.*, 690 F.Supp. 211, 215–16 (S.D.N.Y.1988). Furthermore, the Court must avoid "undue speculation" particularly when the discharged employee is at the lower end of the protected class. *Id.* Speculation is greatest where an award may encompass ten years or more "during which the employee, had he not been unlawfully discharged but continued in his employment, 'might or might not get raises, reductions, fired or incapacitated.'" *Id.* (quoting *Koyen v. Consolidated Edison Co.*, 560 F.Supp. 1161, 1169 (S.D.N.Y.1983)). Essentially, the Court must estimate each Plaintiff's ability to mitigate damages in the future.

■ Defendant argues that the front pay award calculated by Plaintiffs' expert, Marvin Beasley, is overreaching and assumes that each Plaintiff would work through the age of 65 and that each Plaintiff would never attain an earnings level equal to his earnings with Defendant. Defendant contends that Plaintiffs' expert allowed Plaintiffs to "name their own price." Moreover, Defendant argues that Plaintiffs' expert's calculations were inherently flawed and unreliable; therefore, it would be unjust to award the jury's advisory front pay awards which relied on the expert's testimony. Specifically, Defendant asserts that Mr. Beasley's calculations were predicated on incomplete, inaccurate, and uncorroborated data. Defendant maintains that if any front pay is appropriate, the award period must be brief.

Conversely, Plaintiffs argue that the evidence presented at trial relating to front pay is essentially undisputed. Plaintiffs assert that, although Defendant attacked the method of computation by Plaintiffs' expert, Defendant failed to offer any evidence which would effectively rebut any of the evidence relating to front pay damage award.

■ As a preliminary matter, Defendant bears the burden of proving a failure to mitigate damages. Consequently, Defendant's bald assertions that Plaintiffs failed to exercise reasonable diligence in their respective employment efforts is unavailing. However, the jury's advisory verdicts with regards to front pay cannot stand. Although Defendant failed to rebut Plaintiffs' evidence concerning front pay, this Court must discharge its duty to render an equitable and just decision.

During the trial, Defendant objected to the introduction of Plaintiffs' expert's damages report. Defendant argued that Plaintiffs' expert, Marvin Beasley, failed to verify the underlying data of these reports. In fact, Plaintiffs' expert's reports contain the following disclaimer: "Our calculations are based on information obtained from [the individual Plaintiff]. We have not been engaged to, nor have we attempted to, verify the information supplied to us by [the individual Plaintiff]. We understand that this information will be submitted as a matter of proof at trial." Defendant also emphasized that there were instances where Plaintiffs were forced to guess at their actual injuries and Plaintiffs' expert did not ask for sufficient documentation.

During a hearing outside of the jury's presence, counsel for Defendant, Gregory Hare, stated:

We all know what is going to happen if those reports get back there in the jury room. They're not going to do their own math. They're not going to look an see whether the numbers are correct. They're not going to match it up to the tax re-

turns—what limited tax returns have been admitted in evidence.

And, in fact, many of the numbers in those reports that the plaintiffs want to submit are totally controverted by some of the evidence that the witnesses have testified to.

There's no way the jury would be able to sort out all of that. So, that's why we claim that they must be excluded.

(Tr. 18–20 (Docket No. 355)). In rebuttal, Plaintiffs argued that, "the expert is not required to go back and double-check every little number and verify every little number." *Id.* at 23. Plaintiff explained that all of the tax returns for the Plaintiffs were admitted into evidence and that their expert has verified the information to the extent possible. Counsel for Plaintiffs, Ross Goodman, stated, "Mr. Hare's argument that we know what the jury is going to do is offensive because Mr. Hare is saying that we know the jury is going to go back in the jury room and not fulfill their duty." Although the parties stipulated that the damage reports would not be admitted into evidence, Plaintiff's expert was permitted to create a chart outlining front and back pay based on the expert's opinions and the materials he reviewed. Significantly, the jury took every front pay calculation given to them by the expert, added 10 percent to his figures, then placed them on the verdict forms.

Unfortunately, there is a great deal of supposition involved in the calculations provided by Plaintiffs' expert. For example, in Mr. Beasley's calculations regarding front pay damages, he included estimates of Plaintiffs' damages in connection with the lost opportunity to participate in Defendant's savings plan. *Id.* at 138–39. Defendant's savings plan allowed its employees to contribute a portion of their compensation whereby Defendant would match .50¢ for every $1.00 the employee contributed, up to 3%. *Id.* at 139. In other words, to receive the maximum match by Defendant, the employee could contribute 6% of his total compensation and Defendant would match 3%. *Id.* In order to ascertain the amount Plaintiffs have lost as a result of being terminated, Mr. Beasley

asked each Plaintiff whether, "given a certain compensation level, they would have contributed, had they been able to, at those compensation levels." *Id.* Not surprisingly, every Plaintiffs' contribution was estimated at 6% thereby yielding the 3% maximum match by Defendant. *Id.* at 141. As a result, Plaintiffs' expert increased each Plaintiffs' projected damages, with regard to this savings plan component, by 3% regardless of the individual Plaintiff's contribution histories. *Id.* at 140.

In addition, Plaintiffs' expert testified that the questionnaires that Plaintiffs were asked to fill out were not always completed. When Mr. Beasley needed the information which was omitted, he would call the Plaintiff on the phone and ask for the information. So, for example, when a Plaintiff failed to provide information with regards to the cost of health insurance while employed with Defendant, Mr. Beasley would call the Plaintiff and ask for the figures. The problem is that Mr. Beasley never sought documentation to verify these figures. Presumably, the reason so many questionnaires were incomplete, is because the Plaintiffs did not possess the appropriate documentation. However, Plaintiffs provided the jury with figures based on Plaintiffs' undocumented, "newly found" figures, prompted by Mr. Beasley's phone calls.

The Court acknowledges that Mr. Beasley testified that it is customary to rely on his client's representations; however, there is no way to determine whether these figures are accurate, in every category, for every Plaintiff. Although it is impractical to expect that Plaintiffs' underlying data is accurate down to the last penny, the Court is concerned because any inaccuracies are amplified by the long durations for which Plaintiffs seek damages. Moreover, there were several components which were used to calculate front pay damages, including, compensation, savings plan, insurance benefits, pension benefits, and lost Social Security benefits. *Id.* at 130. Mr. Beasley calculated damages for all ten (10) Plaintiffs in this case and he testified that several questionnaires were incomplete and that he had to call each Plaintiff to complete them. However, Plaintiffs did not

indicate whether any of the figures used were merely estimates provided by the Plaintiffs themselves. To complicate matters, Plaintiffs' incomes were based on commissions dependent on production. *Id.* at 148. Moreover, despite the fact that some of the Plaintiff's earnings histories revealed a downward slope, Mr. Beasley still assumed that Plaintiffs' earnings would increase, without exception. *See Id.* at 150–51. Furthermore, even though Plaintiff Hipp and Plaintiff Lee testified that they were each unable to work for a limited period of time during the relevant time periods used to calculate their respective damages because of unrelated physical impairments, Mr. Beasley made no adjustment to the front pay calculations.

Although Plaintiffs represented that all of the materials reviewed by their expert would be admitted into evidence and the expert's reports explained that, "this information [provided by Plaintiffs] will be submitted as a matter of proof at trial," a significant number of the documents which the expert testified he possessed in "his files," were not, in fact, admitted into evidence. As a result, the Court does not have the benefit of all the necessary documentation to determine equitable front pay damages.

In Plaintiffs' Memorandum in Opposition to Defendant's Motion in Limine to Exclude Expert Testimony (Docket No. 193), Plaintiffs addressed Defendant's argument, which has resurfaced here. Specifically, Defendant argues that Plaintiffs are not entitled to an award of damages calculated through age 65 regardless of the individual circumstances. In their memorandum, Plaintiffs explained that, the expert did not improperly assume retirement at age 65; rather, he left that determination to the fact finder. Furthermore, Plaintiffs argued:

"The damage reports all show a present value calculation for front pay on a yearly basis, so that the fact-finder can use whatever age to peg as the year for retirement. And unless the front-pay issue is submitted to the jury, it will be the Court utilizing this grid to determine the expected retirement date, reading across the row, and determining the present value fig-

ure.... Due to Beasley's methodology, he just calculates the numbers, and leaves it to the fact-finder to make the decision."

(Docket No. 193 at 4). Conversely, and disingenuously, Plaintiffs now argue that, "the amounts which were awarded as front pay damages by the jury are clearly supported by the evidence and testimony. presented at trial." (Pls.' Mem. in Sup. of Front Pay and Punitive Damage Awards, Docket No. 322 at 6). Moreover, at trial, the parties stipulated that Plaintiffs' expert's damage reports would *not* be admitted into evidence. Consequently, Plaintiffs have left nothing for the fact-finder to use to make a decision.

While Plaintiffs did, in fact, introduce voluminous financial records related to all ten (10) Plaintiffs, the Court does not have the benefit of the expert's analysis of these records. For example, Plaintiffs introduced portions of documents pertaining to savings plans, retirement benefits, and tax returns for Plaintiffs. However, these documents were not produced consistently for each Plaintiff. Moreover, the tax returns contain various deductions, spouse's income, and income from savings plans. Some Plaintiffs opened their own businesses, invested their savings plans in the stock market, or became involved in other private ventures. The documents in evidence are anything but straightforward. Although Plaintiffs hired an accounting firm to sort through all of this information to provide the trier of fact with a comprehensible summary, the Court does not have such a summary. Moreover, as stated above, Plaintiff's expert had additional sources of information in "his files" which were not introduced into evidence. The Court merely has the final figures provided by Mr. Beasley and a mass amount of financial documents that the Court is ill-suited to interpret.

*Tony Agee*

Plaintiff Agee is 49 years old. Because the jury's front pay award is based on Plaintiffs' expert's calculations through age 65, Plaintiff would be compensated for the next 16 years of his life. Significantly, Plaintiff Agee was hired by Defendant in October 1972, and

worked until termination in 1996. Although Plaintiff Agee still has 16 years in which to attain a comparable level of employment to that which he was forced to leave, the 24 years that he remained with Defendant represents a substantial investment which is not easily recouped. Nevertheless, while it took Plaintiff Agee ten (10) years to become a District Manager, he has also gained approximately twelve (12) years experience in this capacity.

Plaintiff Agee testified that in 1992 he earned $52,888.78; in 1993 he earned $52,-351.89; in 1994 he earned $58,647.33; and in 1995 he earned $51,933.86. Plaintiff Agee was demoted from his position as a District Manager in 1992, but promoted back to a District Manager position in 1994. Plaintiff Agee was terminated in 1996 and testified that his earnings for that year was approximately $40,000; however, Plaintiff Agee explained that he earned approximately $22,000 for the portion of the year he was still employed by Defendant, his wife earned $9,000, and he claimed his withdrawals from his profit sharing as income. In 1997, Plaintiff testified that he earned around $40,000, but that most of it came from his profit sharing. Plaintiff Agee projected that he would earn between $25,000 and $30,000 for 1998. Plaintiff Agee also testified that he pays $274 per month for health and life insurance. Finally, Plaintiff testified that he had $111,000 from profit sharing, but only has $28,000 left.

*Harold Carter*

Plaintiff Carter was hired by Defendant in 1974 and was promoted to District Manager in 1986. Plaintiff Carter was employed as a District Manager for nine (9) years until was terminated in 1995. The jury's front pay advisory award would compensate him for the next eighteen (18) years. Plaintiff Carter testified that he has not held a position in the insurance field after his termination because of the discriminatory treatment he received while employed with Defendant. Plaintiff Carter testified that in 1993 he earned $73,420 .36; in 1994 $90, 535.41; in 1995 $11,525.59; in 1996 between $24,000 and $25,000; in 1997 around $34,000; and in 1998

Plaintiff expects to earn approximately $30,-000.

*David Hipp*

Plaintiff Hipp was hired by Defendant in 1978. After working for Defendant for eight (8) years, Plaintiff was promoted to District Manager. Plaintiff Hipp gained seven (7) years of experience as a District Manager before he was terminated in 1993. The jury did not award Plaintiff Hipp front pay and the Court adopts the jury's advisory front pay award with regard to Plaintiff Hipp.

*James Lee*

Plaintiff Lee was hired by Defendant in 1960 and he was promoted to District Manager in 1983. Plaintiff Lee was terminated in 1993. Mr. Lee was fifty-seven (57) years old when he was terminated. The jury's front pay advisory award would compensate him for four (4) years. Plaintiff Lee testified that his earnings were $113,000 in 1992 and $92,078 in 1993. Plaintiff Lee testified that his earnings in 1994, 1995, and 1996 were $60,000 which he withdrew from his IRA account in equal installments. Plaintiff Lee also testified that he pays approximately $4,000 in insurance for he and his wife each year. In addition, Plaintiff Lee testified that he participated in Defendant's 401k plan "at times" and contributed the maximum amount "during those times."

*Brad Stein*

Plaintiff Stein was hired by Defendant in 1975 and became a District Manager in 1986. Plaintiff Stein worked as a District manager for eight (8) years before he was terminated in 1994. The jury did not award Plaintiff Stein front pay and the Court adopts the jury's advisory front pay award with regard to Plaintiff Stein.

*Mike Stell*

Plaintiff Stell was hired by Defendant in 1978 and after nine (9) years, he was promoted to a District Manager position. Plaintiff gained eight (8) of experience as a District Manager before he was terminated in 1995. The jury's front pay advisory award would compensate Plaintiff Stell for the next eighteen (18) years. Plaintiff Stell testified that

his earnings were: $72,999 in 1992; approximately $53,000 in 1993; approximately $73,700 in 1994; approximately $42,000 in 1995; between $38,000 and $42,000 in 1996; approximately $51,000 in 1997 including his wife's income; and he expects that his income will be approximately $42,000 in 1998. Plaintiff Stell testified that he was forced withdraw approximately $54,000 from his savings plan and profit sharing and that he pays $108 per month in disability insurance.

### Blake Tuggle

Plaintiff Tuggle was hired in 1982 and promoted to District Manager in 1993. Plaintiff Tuggle was employed as a District manager for two (2) years when he was terminated in 1995. The jury's front pay advisory award would compensate Plaintiff Tuggle for the next twenty (20) years, until he reached age 65. Plaintiff Tuggle testified that his earnings were: $72,389 in 1993; $67,834 in 1994; and $52,754.32 in 1995. Plaintiff Tuggle went to work for Allstate Insurance Company after leaving Defendant and testified that he spent around $25,000 in living expenses his first year. Plaintiff testified that he earned $38,751 in 1996, approximately $50,000 in 1997, and anticipates $70,000 in 1998, less expenses. Plaintiff Tuggle testified that his rent, utilities, phone, and advertising costs between $20,000 and $25,000 per year. In addition, Plaintiff Tuggle testified that he spends between $430 and $440 per month for health insurance, but he did not know what he spends on life and disability insurance.

Importantly, it is Plaintiffs' burden to establish the amount of any front pay award. Plaintiffs' expert merely testified as to his final calculations based on unreliable data and calculated through each Plaintiffs' sixty-fifth birthday. Unfortunately, Plaintiffs' expert did not provide the Court with any meaningful instruction in calculating front pay. The Court does not have the resources to construct thorough front pay awards from the evidence provided by Plaintiffs.

It is beyond comprehension that each Plaintiff did not have access to his earnings history as these could have been easily ordered from the appropriate governmental agency during the three (3) years in which this lawsuit was pending. Moreover, Plaintiffs failed to provide testimony regarding the availability of employment opportunities, each Plaintiffs' work and life expectancies, discount tables to determine the present value of future damages, and other facts relevant to prospective damages awards. Front pay awards are compensatory in nature; however, Plaintiffs argue that they are entitled to front pay calculated through their sixty-fifth birthdays, with a 3% contribution from Defendant, in connection with the company's savings plan that the Plaintiffs "sometimes" contributed to, in addition to the 10% added to their expert's final calculations by the jury. Plaintiffs' expert did not testify as to his precise calculations and Plaintiffs failed to introduce sufficient relevant evidence at trial.

The Court finds that front pay awards for Plaintiffs are unduly speculative. The Court is unable to calculate a front pay award, because Plaintiffs failed to carry their burden. Plaintiffs' earnings encompassed a large commission component and their annual earnings fluctuated each year. Despite the fact that some of the Plaintiffs worked for Defendant in a District Manager capacity for more than a decade, Plaintiffs merely provided the Court with a few years worth of earnings and some of these figures were only estimates. Because Plaintiffs' earnings with Defendant fluctuated each year, the Court finds it necessary to compute salary averages; however, due to the fact that some Plaintiffs provided as little as two (2) years worth of earnings, the Court declines to engage in unduly speculative calculations as a result of Plaintiffs' negligence.

For example, Plaintiff Lee only testified as to his earnings in 1992 and 1993, even though, he was a District Manager for ten (10) years with Defendant. Plaintiff Lee's earnings decreased by approximately $21,000 in 1993. Plaintiff Tuggle testified as to his earnings in 1993, 1994, and 1995, while he was working for Defendant. Plaintiff Tuggle's earnings decreased by $4,500 in 1994 and by another $15,000 in 1995. Plaintiff Carter provided two (2) years worth of earnings;

however, he was a District Manager for nine (9) years. Plaintiff Agee provided four (4) years worth of earnings while he was employed as a District Manager; however, he worked in this capacity for twelve (12) years. Plaintiff Stell provided four (4) years of earnings for the years he worked for Defendant; however, he was a District manager for eight (8) years.

Undoubtedly, the Court could construct rough estimates using the figures provided by Plaintiffs. Importantly, however, some of the years for which the Court gives the Plaintiffs credit, are merely estimates. Although the lack of earnings histories alone may not have prevented the Court from making reasonable calculations, additional problems plague the computations. Plaintiffs were required to establish their subsequent earnings in order for the trier of fact to determine each Plaintiffs' actual losses; however, Plaintiffs consistently provided unreliable data.

For instance, Plaintiff Agee testified that after he was terminated, his earnings were around $40,000, although he also testified that his wife's earnings and his profit sharings were included in this figure. Plaintiff Agee testified that in 1997, he "thinks" he earned around $40,000, but that "most" of it came from his profit sharing. These types of figures are unacceptable, especially when accurate figures were accessible.

Plaintiff Carter actually provided figures for 1995, 1996, 1997, and an estimate for 1998. However, Plaintiff Carter admittedly only sought lower paying employment because he was frustrated with the insurance industry.[3]

Plaintiff Lee testified that after he left Defendant, his earnings only consisted of the equal installments he received from his IRA. Plaintiff Lee admitted that he did not seek subsequent comparable employment.

Plaintiff Stell testified as to his earnings in 1995, 1996, 1997, and his projected earnings in 1997. However, Plaintiff Stell bought into an insurance company for $25,000 in 1995. Although Plaintiff Stell testified that in 1995 he earned around $42,000, a few months in 1995 were attributed to his earnings while he was still employed with Defendant. Moreover, the fact that Plaintiff Stell was investing in a business venture adds to the speculative nature of any calculations. Moreover, Plaintiff Stell only provided estimates for 1996 and 1997. In addition, Plaintiff Stell's 1997 estimate included an unspecified amount of his wife's earnings.

Plaintiff Tuggle provided his earnings histories for 1996, an estimate for 1997, and a projection for 1998. Plaintiff Tuggle also invested in a business venture which adds to the speculation. Moreover, by 1997, Plaintiff Tuggle estimated his earnings to be between $50,000 and $55,000, whereas, he only earned $52,754 the last year he worked for Defendant. Significantly, Plaintiff estimated his expenses of rent, utilities, phone, and advertising at between $20,000 and $25,000. This $5,000 window is significant because Plaintiff's estimates of his earnings are similar to that which he was earning while working for Defendant. Moreover, as stated above, salary is not the sole determinative factor and the fact that Plaintiff Tuggle bought his own business immediately after leaving Defendant suggests that Plaintiff Tuggle has "obtain[ed] an opportunity to move to his rightful place" as early as 1997. *See Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1529 (11th Cir.1991).

Although the Court is inclined to deny front pay awards due to the undue speculation caused by Plaintiffs' careless approach to this litigation, the Court is hesitant to issue such a ruling because the clients are the ones who will suffer for their attorneys' apathetic acts. Consequently, the Court is ordering additional front pay calculations from Plaintiffs with regards to Plaintiffs Agee, Carter, Lee, Stell, and Tuggle.

The determination of front pay awards are reserved for the sound discretion

---

**3.** Moreover, although Plaintiff Carter's earning history subsequent to his termination is fairly well supported compared to some of the other Plaintiffs, his earnings history while employed as a District Manager was one of the least supported.

of the district court. While the Court is entitled to submit the issue of front pay to the jury for an advisory opinion, the amount of front pay reasonably necessary to compensate Plaintiffs under the ADEA is not a factual determination, but is a legal issue for the trial judge's equitable discretion. *See Goldstein v. Manhattan Ind., Inc.,* 758 F.2d 1435, 1448 (11th Cir.1985). Accordingly, evidence on the issue of front pay does not have to be presented at trial, as long as the evidence is presented to the district court at some point. *See Downes v. Volkswagen of America, Inc.,* 41 F.3d 1132, 1141 (7th Cir. 1994). "Indeed, it would be somewhat incongruous to require evidence of front pay to be presented at trial when the issue of front pay is not, in ADEA cases, before the jury but is the subject of an equitable determination by the court." *Id.* (citing *Price v. Marshall Erdman & Assocs., Inc.,* 966 F.2d 320, 324 (7th Cir.1992)). Although the Court is willing to accept an additional submission by Plaintiffs' expert, the Court imposes additional restrictions.

■ Plaintiffs' front pay calculations should use actual figures for Plaintiffs' past earnings through 1997. If the actual figures are not available, they should not be included in the calculations. Moreover, Plaintiffs' calculations should take into account the fact that the Plaintiff's earnings have fluctuated over the years and some have exhibited a decline.

■ Furthermore, with regards to the Plaintiffs' savings plan contributions, Plaintiffs' expert must base his projections on the actual histories of the individual Plaintiffs' previous contributions. Plaintiff Agee was a District Manager for twelve (12) years, Plaintiff Carter was a District Manager for nine (9) years, Plaintiff Lee was a District Manager for ten (10) years, Plaintiff Stell was a District Manager for eight (8) years, and Plaintiff Tuggle was a District Manager for two (2) years. If the actual figures for these Plaintiffs' contributions are not available, they should not be included in the calculations.

These same principles must be applied to every category submitted by Plaintiffs. If the figures used by Plaintiffs' expert cannot be supported by evidence, the Court does not want them included in the calculations. Plaintiffs' submission to the Court should be straightforward so that the Court can easily make any adjustments that it deems necessary. Moreover, if the Plaintiffs are seeking damages because their retirement funds or savings plans were depleted, the interdependent calculations must be adjusted accordingly.

Finally, Plaintiffs' calculations must be provided on a yearly basis so that the Court has a means of selecting a particular year in which to end the front pay award. The Court is persuaded by the fact that Plaintiff Tuggle, the Plaintiff with the least amount of experience as a District Manager has obtained subsequent employment in the insurance field and his earnings are substantially similar to his earnings prior to his termination. Plaintiff Tuggle was terminated in 1995 when he was earning $52,754. At trial, Plaintiff Tuggle testified that in 1997, he earned between $50,000 and $55,000 and in 1998 he estimates that his net earnings will be around $50,000.

The Court finds it logical to conclude that the remaining Plaintiffs should be able to obtain comparable employment within three (3) years. As noted above, the remaining Plaintiffs have at least four (4) times the experience as District Managers as Plaintiff Tuggle. The three (3) year time period also encompasses the fact that the more experienced Plaintiffs typically earned more than the junior District Managers and should be given more time to obtain comparable employment. If Plaintiffs fail to adequately comply with this Order, the Court will issue a just and equitable remedy. Accordingly, it is

ORDERED that Plaintiffs' shall submit their calculations for front pay awards, consistent with this Order, no later than the close of business on December 30, 1998; Defendant shall have ten (10) days from the receipt of Plaintiffs' submission to file any objections thereto; the parties shall not re-

visit any arguments addressed in this Order; Plaintiffs shall confer with Defendant and resubmit proposed final judgments for Plaintiffs Ganus, Hipp, Sentell, Stein, and Swanson, consistent with this Order.